KINGS COUNTY.—HON. W. L. LIVINGSTON, SURROGATE.—
September, 1881.

## MILLER *v.* WHITE.

*In the matter of the probate of the will, and a codicil thereto, of* ANNA M. WHITE, *deceased.*

The burden of proving that a testator was not of sound mind at the time of the execution of a will, rests upon the one contesting the probate; so that if, upon the whole evidence, that fact remains doubtful, the will cannot be rejected on that ground.

Where a will is made in a sound state of mind, and is subsequently revoked without the slightest evidence of any change of purpose, or any ground for it, after the testator has shown signs of breaking up mentally, the revocation may be attributed to delusion.

The testatrix, in 1877, made a will, giving to her niece, who was her only next of kin, and of whom she had always been fond, certain legacies and an annuity of $1,000. In 1878, signs of mental disturbance began to be noticeable in testatrix, including a great change for the worse in her personal habits, conduct and feelings, she becoming untidy, morose, unsociable, and subject to delusions, in particular taking a great and causeless dislike to her niece, suspecting the latter's motives in visiting her, declaring that she hated her, and even accusing her of pilfering. In March of that year, after the appearance of these symptoms, testatrix executed a codicil for the sole purpose of revoking all the provisions in her will, made in behalf of her niece. Experts and one of the subscribing witnesses testified to an impairment of testatrix's faculties, occurring after the will was executed.

*Held,* that, although the mental deterioration testified to might not have deprived testatrix of the moderate degree of capacity necessary to enable her to make a testamentary disposition, the codicil must be refused probate, as being the direct offspring of an insane delusion, on her part, in respect to her niece.

MILLER *v.* WHITE.

APPLICATION by R. C. White, executor, etc., for the probate of a will and codicil. The contestant, Josephine Miller, opposed the probate only of the latter instrument. One attesting witness to the codicil thought the testatrix of sound mind at the time of its execution ; but the other witness was of a contrary opinion. The contestant claiming that the burden of proof was on the proponent, the matter was submitted, with the understanding that, if the court found against the contestant, she should be allowed to put in proofs.

L. BENNETT, *for proponent.*

L. MARCELLUS *and* CHAS. BRADSHAW, *for contestant.*

THE SURROGATE.—As the evidence now stands, the will and codicil must be admitted to probate. The *onus* of proving that the testatrix was not of sound mind when she executed the codicil, rests on the contestants. It may be that it is expected of the party offering a will for probate, that he will examine the subscribing witnesses, as to the condition of the testator's mind, but that does not relieve the contestants of the burden of proving that it was unsound ; so that if, upon the whole evidence, that fact remains doubtful, the will cannot be rejected on that ground (*Redf. Prac.* [2 ed.], 215, 216 ; *Redf. Am. Cas. on Wills*, 28, note ; 1 *Redf. on Wills*, 46 ; *Dayton on Surrog.* [3 ed.], 57, 175 ; Delafield *v.* Parish, 25 *N. Y.*, 72, 97 ;* Jackson *v.* King, 4 *Cow.*,

---

* The following are extracts from a communication by THOMAS G. SHEARMAN, Esq., to the Albany Law Journal, July 16, 1881:

" I speak doubtfully concerning the Parish will case, because it is by no means easy to tell what legal principles were decided in it. One judge read an opinion holding that the sanity of the testator had been left in great doubt, and that the will should therefore be rejected; and in this four

207 ; Ean *v.* Snyder, 46 *Barb.*, 232 ; Brown *v.* Torrey, 24 *Id.*, 583).

Subsequently, further evidence having been adduced,

judges concurred. Three judges held that the testator was sane. One of these laid down the abstract proposition that the burden of proof, as to insanity, was upon the opponents of a will; and in this dictum four judges concurred. But dicta do not make law; and the evident fact that the will was rejected because the court remained in doubt as to whether the testator was sane or insane, makes this case, in my opinion, an authority against the dictum.

" The precise point has not again come before our court of appeals; but in Rollwagen *v.* Rollwagen (63 *N. Y.*, 504), the court unanimously held that a will made by a testator of unquestioned sanity must be rejected because he labored under some infirmities which left it doubtful whether he fully understood the effect of its provisions; the court saying that in such cases the proof that the testator 'understood and assented to' such provisions 'should be quite clear and satisfactory before it should be admitted to probate.' And the court cited the opinion of Davies, J., in Delafield *v.* Parish, with approval; that opinion being the one in which it was held that the burden of proof as to the sanity of the testator was upon the proponent of the will. Surely, if the burden of proof is cast upon the proponent to show that a sane but sick testator fully understood the will, the court would not admit a will to probate upon evidence equally balanced, as to the testator having mind enough to understand anything. The earlier decisions, as Judge Davies showed in his opinion, hold that the burden of proof is upon the proponent in this respect. Judge Gould, in his dissenting opinion, relied upon the general rules of evidence in relation to contracts and other acts between living persons.

" Finally, let us ask what practical experience tells us is, and what reason tells us should be, the actual law in this matter. . . . . Is there any Surrogate who admits a will to probate without asking the subscribing witnesses whether the testator appeared to be of sound mind ? The Surrogates of New York and Kings County certainly do not. . . . . Would he (the Surrogate) have accepted a will if, when he asked the witnesses whether the testator was of sound mind, they had replied that it was none of his business, or even that they were utterly unable to say whether he was or not? If the evidence is so conflicting that the Surrogate is utterly unable to determine whether the testator was insane or not, shall he sustain the will? Would the general term sustain him if he did? If the case is sent to a jury and they all come into court, saying that the mind of every one of them is evenly balanced on the issue of sanity, would the court direct them to give a verdict in favor of the will? If not, why not?

MILLER v. WHITE.

the Surrogate delivered the following opinion, wherein the facts sufficiently appear.

THE SURROGATE.—In September, 1877, the testatrix

"A little thought shows that there is a great deal of difference between a will and a contract. The business of life cannot go on without contracts; but it can go on perfectly well without wills. The law makes a will for every man, which is generally better than any he can make for himself. Contracts are matters of natural right, recognized by common law. Wills are matters of artificial right, dependent upon statutes. No man has any real interest in his property after his death; and experience has shown so strongly the danger of allowing men to tie up property after their death, that their power to do so is hedged about with many restrictions. The presumption is that every will is unjust; for it always makes some disposition of property which is contrary to the general experience of mankind, as embodied in the law. Of course the circumstances of each case may remove this presumption; but it is only reasonable to refuse to give effect to such dispositions of property, so long as any doubt remains as to the perfect soundness of mind of the testator. And for this reason the law sets aside wills on a degree of proof, either as to sanity or undue influence, which would make no impression in an action to set aside a contract.

"I am aware that this doctrine is not universal law, and that in Pennsylvania, Maryland, Delaware, Kentucky, and perhaps New Jersey and other States, the proponent of a will is not required to give any evidence as to the testator's sanity. But he is in New York, as is conceded by the last case in which it is said that the burden of proof is not on him (Harper v. Harper, 1 *N. Y. Sup. Ct.*, 351, 355); and it is the settled rule in Great Britain and Ireland, Maine, New Hampshire, Massachusetts, Connecticut, Georgia, Illinois and Michigan, that a will cannot stand if the testator's mental capacity is left in grave doubt (Barry v. Butlin, 2 *Moore's P. C.* 480; Baker v. Batt, *Id.*, 317; Sutton v. Sadler, 3 *C. B.* [*N. S.*], 87; Symes v. Green, 1 *Swaby & T.*, 401; Keays v. McDonnell, 6 *Irish Rep. Eq.*, 611; Robinson v. Adams, 62 *Maine*, 369; Cilley v. Cilley, 34 *Id.*, 162; Boardman v. Woodman, 47 *N. H.*, 120; Perkins v. Perkins, 39 *Id.*, 163; Crowninshield v. Crowninshield, 2 *Gray*, 523; Baldwin v. Parker, 99 *Mass.*, 79; Comstock v. Hadlyme, 8 *Conn.*, 261; Potts v. House, 6 *Ga.*, 324; Rigg v. Wilton, 13 *Ill.*, 15; Taff v. Hosmer, 14 *Mich.*, 309; Kempsey v. McGinnis, 21 *Id.*, 123, 147; Aiken v. Weckerly, 19 *Id.*, 482, and other cases). And although the earlier decisions in Vermont in the time of Chief Justice I. F. REDFIELD were to the contrary, they have been overruled in that State, and the British doctrine followed (Williams v. Robinson, 42 *Vt.*, 658). Being confident that this is the law of New York, I think . . . . too, that this was the rule actually applied in Delafield v. Parish."

See, also, Dickie v. Van Vleck, *ante*, 284, at p. 286.

made a will, whereby she gave to Josephine Miller certain legacies, and also gave to her executor the sum of $40,000, in trust for certain designated purposes ; among others, to pay from the interest of said fund $1,000 a year to the said Josephine Miller.   It is conceded that, up to that time, the testatrix was of sound mind, and no question is raised as to the will.

In March, 1878, the testatrix executed a codicil, for the only purpose of revoking all the foregoing legacies to Miss Miller.   It is this codicil that is contested.  Its execution has been proved, and there is no evidence that it was obtained through undue influence ; but the contestant claims that, shortly after the execution of the will, the testatrix's mind began to fail, and that, at the date of the execution of the codicil, she was of unsound mind.

The evidence shows that Miss Miller was her niece, and her only heir and next of kin at the time the codicil was executed.   The testatrix had always been fond of her, and treated her well and kindly up to the year 1878, when signs of mental disturbance began to manifest themselves in the testatrix, and a great change was noticeable in her conduct and feelings.   Whereas she had formerly been neat and particular in her personal appearance, hospitable and generous in her way of living, lady-like, sociable and agreeable in her intercourse with others, now she was careless and slovenly, mean and close, vulgar, averse to company, abusive and suspicious. She also had delusions, believing that she saw people who were dead or not present.   She took a great dislike to her niece, Miss Miller, and began to suspect her motives in visiting her, and even her honesty, accusing her of carrying off things in her pockets.

Eliza Marsh, one of the witnesses to the codicil, says that she does not think that the testatrix was competent to make it ; that she had a fall in 1878, and never was in her right mind after that. It is true that the weight of this witness's opinion is much impaired by the fact that she was a witness to the codicil, and that she offers no explanation of the inconsistency between her opinion as to the soundness of the testatrix's mind and her willingness to act as a witness to the codicil ; but she gives the facts on which she bases her opinion, and the well-known and very competent experts who were examined, are also of the opinion that the testatrix's mental faculties had become impaired ; but whether to the extent of depriving her of that moderate degree of capacity necessary to enable her to make a will is not so clear (Delafield v. Parish, 25 *N. Y.*, 9).   It might well be, therefore, that the codicil should not be set aside, were it not clear that it was the direct result of delusion on the part of the testatrix respecting her niece (Seamen's Friend Society v. Hopper, 33 *N. Y.*, 619, 625 ; Dunham's Appeal, *Redf. Am. Cas. on Wills*, 93).   Absurd prejudices, groundless antipathies, silly and chimerical hatreds, originating in acknowledged insanity, are evidences of the existence of delusion (Boyd v. Eby, *Redf. Am. Cas. on Wills*, 218, 222).   Insane delusion may exhibit itself by hating, without cause, persons formerly loved (Head-note to Bitner v. Bitner, *Redf. Am. Cas. on Wills*, 751, 752) ; and where a will is made in a sound state of mind, and is subsequently revoked without the slightest evidence of any change of purpose, or any ground for it, after the testator has shown signs of breaking up mentally, the

revocation may be attributed to delusion (Note to Duffield *v.* Morris, *Redf. Am. Cas. on Wills*, 206, 217).

In the principal case, there is absolutely nothing to account for this codicil, but the dislike taken by the testatrix to her niece, without any apparent cause whatever, after the testatrix's mental faculties had become impaired, and which must be attributed to delusion,—delusion evidenced not only by the sudden and unaccountable change of feeling on the part of the testatrix towards her niece, but by the testatrix's own declarations, to the effect that she hated her niece, that her niece came to see her to take things away, and that she carried them away in her pockets. A decree, admitting the will to probate, and rejecting the codicil, may be submitted.