NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.—
November, 1881.

## DICKIE v. VAN VLECK.

*In the matter of the probate of the will of* PATRICK
DICKIE, *deceased.*

The instrument propounded was executed in 1871. A week or two before
its execution, decedent called upon the lawyer who drew the will, and
who knew nothing of his property, his family, or his testamentary
purpose; gave him instructions, with intelligence and coherence, as to
its provisions; made an appointment for an interview at decedent's
house, which was had, and at which a draft of the will was left for
examination; and afterwards came to the office of the drawer, and ex-
ecuted it. The will, itself, evinced an intelligent understanding of its
terms, on the part of decedent, and a knowledge of the claims of the mem-
bers of his family upon his bounty; but the testimony was conflicting as
to his conversation and conduct before, during and after 1871. A few
weeks after the execution, he wrote a letter to his son in Europe, for
the most part intelligent and coherent, yet containing an unreasonable
and unintelligible suggestion upon a single topic. In 1870, he mani-
fested certain delusions, which, however, it appeared, were due to ill-
ness, from which he recovered. In 1871 and 1872, the evidence showed
that he had a clear understanding of the character and value of his
property, as exhibited by his statements to his agents, employed to
manage the same; by intelligent accounts kept with those with whom
he dealt; by employing workmen to repair his houses, and paying them
according to contract, and in other ways. In 1874, he was adjudged a
lunatic. He died in 1877, aged eighty-four years.

*Held,* that,—even conceding that decedent was of impaired mental capacity
and that, therefore, more than proof of formal execution was necessary
to show that the alleged execution was his intelligent and deliberate
act,—such additional proof was abundantly furnished by the evidence;
that, upon the whole case, he must be deemed to have been of sound
mind at the time of the execution, and that the petition for probate
should be granted.

The rule, in Delafield v. Parish, 25 *N. Y.*, 9,—concerning the burden of
proof of testamentary capacity,—explained.

Medical experts on insanity,—reviewed.

The testator, by his will, gave the residue of his estate, after payment of
debts and funeral expenses, to the executors, in trust, to pay one-sixth

of the net income, quarterly, to each of six descendants for life, and, on the death of any one of them, to transfer his share absolutely to his issue, or in default of issue, to the survivors and their representatives, equally, *per stirpes.* *Held,*

1. That the provision, as regarded the descendants, was equivalent to a gift of a life estate to each, in severalty, and that there was no suspension of the absolute ownership, or power of alienation, of any share, longer than for the life of the particular beneficiary, after which, by the terms of the will, the share vested absolutely.

2. That this result was not affected by the vesting of the estate in trustees, for the purpose of receiving and paying over the income, the suspension being the same as if the gift of the income for life had been directly to the beneficiaries.

Monarque *v.* Monarque, 80 *N. Y.* 320,— compared.

APPLICATION for the probate of a will, by Emma D. Van Vleck, a daughter and an executrix, etc., of decedent, who died in November, 1877, aged eighty-four years, and leaving an estate of over $800,000.

Objections to the probate were filed by Edward P. Dickie, a son of decedent, and others, on the grounds that the instrument propounded was not the last will and testament of decedent; that he was not of sound mind; that he did not acknowledge the same or declare it to be his last will and testament; that the witnesses did not sign at decedent's request; that decedent revoked and annulled the same; that it was procured by undue influence; that it was not executed in manner required by law; and that the trusts and powers were void by the laws of this State. Further facts appear in the opinion.

ROBINSON & SCRIBNER, *for proponent.*

BOARDMAN & BOARDMAN, *for contestant E. P. Dickie.*

THE SURROGATE.—[After a review of all the testimony.]—The first question to be considered is whether the proof of the factum of the will is sufficient to justify its

probate.   Defendant's mental capacity being established, the contestants' counsel claims that there is not sufficient evidence to satisfy the mind of the court that the paper propounded really represents the intention of the testator ; and in this connection, the facts as to the preparation and execution of the instrument should be stated. Mr. Peckham testified to the due and formal execution of the instrument according to the facts stated in the attestation clause ; that a week or two before its execution, decedent, being an entire stranger to him, called upon him to draw his will, and that he then received instructions from him as to its provisions, and made a memorandum thereof, and then made an appointment with the decedent to meet him at his house ; and that, after making a draft of the instrument from the instructions, he called at the house and saw decedent and left it with him for examination, and that he afterwards came to the office and executed it; that decedent gave his instructions with intelligence and coherence ; there was nothing in his manner to attract his attention. Counsel for contestants cites the case of Delafield v. Parish (25 N. Y., 9), as authority for the doctrine that the burden of proof, that the decedent had testamentary capacity, is upon the proponent, which is undoubtedly true, on the consideration of the whole testimony in the case ; in other words, that the court must be satisfied that the decedent had mental capacity at the time of the execution of the instrument ; but a careful examination of the case cited does not warrant, as seems to be supposed by the counsel, the doctrine that in the first instance, as a part of the factum of the will, it is incumbent upon the proponent to show affirmatively that the testa-

tor is of sound mind, though that is stated in the opinion of DAVIES, J.; but at page 97, there is the concurrence of a majority of the court to the statement that the legal presumption is that every man is *compos mentis*, and the burden of proof that he is not *compos mentis* rests on the party who alleges that an unnatural condition of mind existed in the testator; that he who sets up *non compos mentis* must prove it; so that the proof was amply sufficient to admit the will to probate when the proponent rested; and any question of doubt as to mental capacity, or proof that the decedent did not intelligently understand the provisions of his will, are matters of affirmative proof by contestants. In Croft *v.* Day (1 *Curteis*, 782), cited by contestants' counsel, the fifth codicil was rejected, on proof that the decedent was, at its execution, of fluctuating capacity, the codicil having been prepared by a solicitor in his own favor, because the court was not satisfied that decedent understood the contents of the instrument, and intended it to operate, there having been no instructions given by the testator for the drawing of the instrument, though it appeared that it was read to decedent before execution. The affirmance of this case (3 *Moore*, *P. C. C.*, 136), needs no comment.

In Sankey *v.* Lilley (1 *Curteis*, 397), cited by the same counsel. the will was rejected, the subscribing witnesses only being examined, where the decedent was of advanced age and infirm, 'where the instrument was drawn from the instructions of the executor, none having been given by decedent, she being upward of eighty years of age, very infirm, deaf, almost blind, and bedridden for years.

In Ingram *v.* Wyatt (1 *Hagg. Ecc.*, 384), it was held

that mere evidence of ·execution by a person of weak, inert mind, appointing his attorney, the agent, sole executor and almost universal legatee of a very large property, was insufficient without proof of instructions, where the instructions were given to the solicitor in the handwriting of the executor's father, the codicil being prepared exclusively for his own benefit by the executor, in whose house the decedent was living apart from his family, and óther circumstances strongly inferring fraud and circumvention. The case is so utterly dissimilar from the one under consideration that it is difficult to understand why it should have been cited.

In Mitchell *v.* Thomas (6 *Moore, P. C. C.*, 137), the instrument was propounded by the drawer and beneficiary, which was executed when decedent was of doubtful capacity, without evidence of instructions or knowledge of the contents, and it verified the bequests of the will in behalf of the drawer, and was executed when the testator was supposed to be dying, and the only evidence as to the knowledge of the testator in that enfeebled condition was that the codicil was presented to decedent while in bed for him to read ; the proof was not sufficient to enable the court to find that he did read it, much less understand it.

The case of Durnell *v.* Corfield (1 *Robertson Ecc.*, 51) does not materially differ from those already cited, and they all seem to be cases ˙where no instructions were given by the decedent for the drawing of the instrument, and they were either what may be denominated undutiful wills, or the persons drawing them, or procuring them to be drawn, were beneficiaries thereunder.

In the case of Horn *v.* Pullman (72 *N. Y.*, 269), the

decedent, eighty-three years of age, of impaired mental and physical powers, made a will, leaving the bulk of his property to his grandson, excluding his children, differing somewhat from former wills; his children visited him seldom, and declined to have him live with them, which he complained of, although their relations were friendly; he gave instructions for the will without suggestions from others, and stated the reasons for the changes he desired to make; the will was read to him after being drawn; he pronounced it right and executed it, and it was admitted.

In Rollwagen *v.* Rollwagen (63 *N. Y.*, 504, 517), EARL, J., says: "When the testator executes a will in the mode required by law, the fact of such subscription and execution are sufficient proof that the instrument speaks his language and expresses his will, but when the testator is deaf, dumb, and not able to read or write or speak, something more is demanded; there must be then not only proof of the factum of the will, but also that the mind of the testator accompanied the act, and that the instrument executed speaks his language, and really expresses his will."

In Weir *v.* Fitzgerald (2 *Bradf.*, 42), the Surrogate says: "Something more is necessary to establish the validity of the will in cases where, from the infirmity of the testator, his impaired capacity or the circumstances attending the transaction, the usual inference cannot be drawn from the mere formal execution. Additional evidence is, therefore, required that the testator's mind accompanied the will, that he knew what he was executing, and was cognizant of the provisions of the will."

In this case, there is nothing in the terms of the will

to make it undutiful, for though the contestant Edward
P. Dickie is not a beneficiary, yet his only child, a
grandson of the decedent, is given precisely the same as
decedent's children, except Edward, who therefore
stands in his father's shoes in that particular ; and the
fact is admitted that Edward was possessed of an ample
fortune. Besides, the circumstances under which the
will was drawn and executed raise no presumption of
fraud or imposition, and the most that can be said is
that decedent was of impaired mental capacity, and that
for that reason the court should require something more
than the formal execution of the instrument to indicate
that the will was the deliberate, intelligent act of the
decedent, and that he appreciated its terms.

It seems to me that this additional proof is abun-
dantly furnished by the fact that the will, as to its pro-
visions, was dictated by decedent to a strange attorney,
who knew nothing of his property, his family, or other-
wise of his testamentary purpose ; affording, to my mind,
much stronger proof of his intelligent volition, than
would have been evinced by the production to the attor-
ney of written instructions, though in his handwriting,
for those may have been the result of suggestions or
dictation of interested parties ; indeed, the case, to my
mind, is wholly divested of any suspicious interference
with his disposition, and leaves no doubt in my mind
that the will was his deliberate and intelligent act, un-
less the testimony shall warrant the conclusion that he
was of unsound mind at the time of execution. I am
thus brought to the consideration of that question, in
which I am of the opinion that the circumstances of the

dictation and execution of the instrument will form a very significant feature.

In considering the question of decedent's mental capacity or condition at the time when the instrument propounded was executed, as indicated by the testimony in the case, it will be necessary to observe that the fact that decedent, in 1874, was adjudged a lunatic, is calculated to influence, to some extent, the testimony of the witnesses in respect to his mental condition in 1871, prior and subsequent thereto.

It is very difficult to reconcile the testimony of the respective witnesses, as to conversations and conduct of the decedent before, during, and after 1871 ; for, while contestants' witnesses gave various strange sayings and doings of the decedent, and claimed that he was incorrect and irregular in his conversation, and his manner suggestive of unsoundness of mind, yet those witnesses testify to a period covered by the testimony of the proponent's witnesses, including the two agents, Mr. Kissam and Mr. Woodruff, embracing his tradespeople, various mechanics and workmen, all of whom gave detailed statements of their intercourse and dealings with him, and stated they observed nothing in his manner different from that which they had observed years before, and nothing to excite their attention as unusual and extraordinary ; and it is inconceivable that both classes of witnesses can testify truly, for if he manifested such signs of mental derangement, from time to time for a series of years, as are testified to by contestants' witnesses, it is impossible to conceive that those dealing with him during the same time, who testified in behalf of the proponent, can have failed to observe such mani-

festations, and it is hardly credible to suppose that the various acts of intelligent business dealings by the decedent could have been performed without the evidences of unsoundness testified to by the contestants' witnesses ; and hence, in this conflict, it becomes important to determine where the truth lies from such testimony as is least liable to mistake or misconception, the most important of which seems to me to be afforded by decedent's instructions, and the intelligent provisions of his will, evincing an understanding of its terms, and knowledge of the claims upon his bounty by members of his family ; and the fact that he had personal and real estate, and made provision for the income thereof to be paid in due proportion to those members ; and the recognition subsequently of the fact that he had made a will and had not given the contestant Edward anything therein, and stated whom he had named as executors ; and that in 1872 and 1873 he evinced a clear understanding of the character of his property and its value, in his statements to his two agents whom he had employed to care for the management of his estate, and intelligent accounts which he kept of various transactions with persons with whom he dealt, and his servants, his collection of rents and the proper accounts thereof, entering the amounts due, and giving receipts therefor, employing numerous workmen to make repairs upon his house and other property, and paying them according to the terms of the contract, and consulting with Mr. Woodruff as to the respective leases which he executed of his real estate—all combine to indicate to my mind that the alleged manifestations of incoherence, suspicions and delusions must have been greatly exaggerated by the witnesses who testified to the facts

forming the basis of the hypothetical questions upon which the distinguished experts in this case gave their opinions of decedent's condition. And it is my duty, as well as a pleasure, to state that those opinions are of much more than usual satisfaction to a legal mind; for they stated that, if the intelligent and coherent conduct of important business matters by decedent as testified to by numerous witnesses was true, they would be led to doubt the truth of the facts set forth in the hypothetical questions, and that in such a case they would deem it necessary, in forming a safe conclusion, to know more of the general character, early history, habits and peculiarities of the decedent—according with the opinion which I have long entertained, that isolated incidents in the life of intelligent, educated and cultured people might be so grouped together as to make the most sane of men appear to have been mentally unsound, and that, in order to a wise and safe judgment, isolated incidents usually presented to experts need to be supplemented by a statement of the general character, conduct and habits of the person, for all of those are needed to determine the character of the man.

Another fact which seems to to me have a most important bearing upon the value of the experts' opinions in this matter is that they concur in regarding the statements of the decedent, in 1870, to the servant Kenney, that his house-keeper was an English spy, and her numerous boxes filled with gunpowder, and that he ordered a barrel of flour sent from the basement because it contained a dead body, as among the most controlling evidences of mental unsoundness; and yet the servant Kenney testified that those things occurred when the decedent was very ill,

and that, in a short time after, he entirely recovered; and the testimony given by Dr. Gray and by the contestant Edward P. Dickie, as to what the doctor said of dece- ·dent's condition mentally, when he visited him, was shown by the latter to have been at a time when he was very ill, and that in the course of ten days he recovered.

I am, therefore, of the opinion that the facts stated in the hypothetical questions, upon which the experts based their opinion·that decedent was not of sound mind in March, 1871, when the instrument propounded was executed, have been substantially disproved, and there- with those opinions must fall as a basis of determining the issue in this case.    It is also proper to observe that many of the facts and incidents stated in the hypothetical questions, upon which the experts gave their testimony, occurred at a considerable period subsequent to the execution of the instrument propounded, ranging from that time to 1874, a fact which militates considerably against the safety of the opinions expressed by the experts respecting his mental condition at a time when the in· strument was executed, for they all agreed that the con· dition ascribed to him was of a progressive character.

A piece of testimony which militates most strongly against the mental condition of the decedent, at the time of the execution of the will, appears to me to be his extraordinary letter written to his son Horace, in Europe, in 1871, a few weeks after the execution of the will, for while most of the letter seems to be intelligent and coherent, and in strict consonance with the character of his will, yet there is that which relates to Mrs. Turell, her obstacle to the family compact, and the mode sug- gested by which it was to be overcome, which is entirely

unreasonable and unintelligible by any testimony furnished in this case, yet I do not feel warranted, upon that piece of evidence alone, to override all other evidence in the case, showing his mental soundness when he executed the will and for years thereafter; and I am of the opinion, upon the whole testimony, that the decedent when he executed his will was possessed of sufficient capacity to comprehend the condition of his property, his relations towards the persons who were or might be the objects of his bounty, and the scope and bearing of the provisions of his will; which is the adjudged capacity requisite for the due execution of such an instrument (Delafield v. Parish, 25 N. Y., 9; Van Guysling v. Van Kuren, 35 Id., 70; Tyler v. Gardiner, 35 Id., 559; Kinne v. Johnson, 60 Barb., 69; Meeker v. Meeker, 75 Ill., 260; Bundy v. McKnight, 48 Ind., 502; Horn v. Pullman, 72 N. Y., 269).

There is no testimony in this case, tending to show the exercise of any restraint or undue influence upon the decedent, respecting the execution or provisions of his will.

This brings me to the consideration of the question raised as to the validity of the trusts contained in the will; and, for convenience, it will be well to state here the provisions which are called in .question. By the second clause the residue of decedent's estate is given to the executors, in trust, to pay one equal sixth part of the net income, quarterly, to five of his children respectively, and to his grandchild, Perry Dickie, for life; and when one of the cestuis que trust shall die, the trustees are directed to transfer and convey to his or her issue one-sixth of the personalty, and the one undivided sixth

of the realty ; in case he or she shall not leave issue, then said sixth of the personalty and realty to be given and conveyed to the surviving beneficiaries named, equally, and to the heirs and personal representatives of such as may have deceased, equally, *per stirpes* and not *per capita.*

The trustees are also empowered, when deemed expedient, to use the personalty for the erection of buildings upon or otherwise improving the real estate.

It is further provided that when it shall seem desirable, after the death of any of the *cestuis que trust* first named, to partition and divide the property; the said trustees are empowered so to do, into six parts or less, as they shall deem best, and convey to such persons as shall be entitled under the will, the several, instead of the undivided portion of the real estate, and in case the partition shall be impracticable, they are empowered to sell, convey, and hold the proceeds, and divide the same according to the provisions of the will.

It is claimed by the contestants' counsel that the alienation of the real estate, and the ownership of the personalty, are suspended for more than two lives in being, in violation of the statute (2 *R. S.*, 1101 [6 ed.], §§ 14, 15 ; *Id.*, 1167, § 1).

In Monarque *v.* Monarque (80 *N. Y.*, 320 ; S. C., 8 *Abb. N. C.*, 102), it was held that the gift of an income to decedent's four daughters, for life, was equivalent to a devise to them of a life estate in the land, in severalty, of one-fourth of the property, and from that well-considered case, based upon the authorities cited, it follows that the gift of the income of the estate for life to the respective sons, daughters and grandchild of the deceased would,

in this case, if no trustees intervened, have been a devise of a sixth part of decedent's estate for life to the respective sons, daughters and grandchild in severalty, and that, therefore, in such case, there would have been no unlawful suspension of alienation of the real estate, or ownership of the personalty ; for each sixth share would have been suspended for the life of the wife and the life of the respective beneficiaries, when the estate in severalty became vested ; and the case under consideration is stronger than that of Monarque *v.* Monarque, above cited, for the reason that, in the same clause of the will under consideration, whenever any of the beneficiaries named should die, then the trustees should deliver and convey to the lawful issue, if any, one-sixth part of said estate ; in case of no issue, then to the surviving beneficiaries absolutely ; clearly, as it seems to me, indicating a design that the property should vest in severalty, under the will, in the respective issue or survivors ; and the suggestion of counsel for the contestants, that after the death of the widow* and one of the legatees, the two lives provided for by the statute have been exhausted, and that the shares of the survivors and the power of alienation are suspended for more than two lives—to wit, until the death of those whose death shall precede the particular beneficiary is answered, for the reason that, the devise being in severalty, there is no suspension of the ownership or power of alienation going to any particular beneficiary for a longer period than the life of the widow

---

* As decedent left no widow, there was no life estate preceding those of the five children and one grandchild. It is understood that the two lives referred to in the argument of contestants' counsel were those of the two descendants of the decedent, beneficiaries, first dying.—REP.

and his own life, when, by the terms of the will and the construction referred to, there is an absolute vesting of the property, with full power of alienation.

In Manice *v.* Manice (43 *N. Y.*, 303, 368, 369), Judge RAPALLO states the general rule to be that, where by a will shares or interests in real or personal estate to be ascertained by a division are given, or where real estate is directed to be sold and the proceeds divided, the estate or interest of the devisee or legatee, in the property to be divided or converted, is a vested interest before the conversion or division; but if the intention is unequivocally expressed otherwise, effect must be given to it, but that such an intention will not be imputed to the testator, if it can be avoided.

The only remaining question, as it seems to me, needing consideration is whether, by the intervention of trustees and a devise to them of the income for the benefit of the so-called second life tenants, there is any different suspension of alienation. Upon the best consideration that I have been able to give the subject, I can see no reason why the vesting of the estate in a trustee, for the purpose of receiving and paying over the income for the benefit of the legatees, should be any different suspension than there would have been if the devise of the income for life had been directly to the beneficiaries, instead of to a trustee ; indeed, the case of Monarque *v.* Monarque, cited, was a case where a trustee intervened.

I am, therefore, of the opinion that the provisions of the will questioned by the contestants are valid, and that the proof in this case establishes the due execution of the instrument, according to the requirements of the

statute, by the decedent, when he was of sound, and disposing mind and free from restraint.

Decreed accordingly.