MONROE COUNTY.—HON. J. A. ADLINGTON, SURROGATE.—February, 1885.

POTTER *v.* McALPINE.

*In the matter of the probate of the will, and codicils thereto, of* HENRY S. POTTER, *deceased.*

The sanity of every man, and his capacity to make a will, are to be presumed until the contrary appears, and the burden of proving mental disability is on him who asserts it.

The court, when asked to reject an alleged will, can pay no heed to such considerations as that the same is mean, unjust and inequitable; or that it withholds the absolute ownership of decedent's property from his own children, or makes unequal provisions for them; or that public sentiment and the moral sense of the community condemn the instrument and its author.

The prevailing system of presenting, in the courts, the testimony of medical experts upon the question of sanity,—criticised, as being poorly calculated to assist in arriving at the exact truth.

The sixth subdivision of decedent's will made the enjoyment, by one of his sons, of the income of a share of the estate conditional upon the beneficiary's not living with, or in any manner contributing to the support or maintenance of his wife.—

*Held,* that the condition was precedent, and illegal and void, being both against public policy and good morals, and one which would require a

violation of the statutes (Code Crim. Pro., §§ 899–904); and that the gift was discharged therefrom and valid.

Testator, by a codicil to his will, provided: "Nor shall my executors and trustees be obliged or compelled to file with the Surrogate any inventory of my estate." Upon the application for probate,—

*Held*, that it is against public policy to permit such interference with the forms of procedure established by law, removing the barriers designed to protect estates from misappropriation; and that the clause in question was invalid and of no effect.

PETITION for the probate of the will, and codicils thereto, of decedent, presented by Byron D. McAlpine, one of the executors therein named; opposed by Charles B. Potter and others, decedent's children. The facts appear in the opinion.

D. D. SULLY, *for proponent.*

COGSWELL, BENTLY & COGSWELL, and J. A. STULL, *for contestants.*

THEO. BACON, *and* WM. C. ROWLEY, *special guardians.*

THE SURROGATE. — The instruments, propounded for probate and purporting to express the testamentary intentions of the decedent, are the alleged will, dated June 19th, 1880, and three codicils thereto, bearing the respective dates of July 8th, 1881, September 13th, 1882, and August 17th, 1883. The probate is contested by Alfred B. Potter and Charles B. Potter, the sons of the decedent, and by his unmarried daughter, Miss Henrietta Potter, on the grounds of failure to comply with the formal requirements of the statute, in the execution of the several instruments, and also lack of testamentary capacity. The answers of the contestants also put in issue, under § 2624 of the Code of Civil Procedure, the validity of the dispositions of property made by the

*sixth* and *ninth* subdivisions of the will, and allege that the same are illegal and void.

Mr. Henry S. Potter died at the city of Rochester, N. Y., January 9th, 1884, aged about eighty-six years. He left surviving him the contestants above named, and two married daughters, Mrs. Mary E. Hart and Mrs. Susan P. McAlpine. His estate amounts to about $1,250,000, of which $250,000 is in real estate.

The will, omitting the subdivisions alleged to be invalid, gives the entire estate of the decedent to certain persons named as executors and trustees, to hold in trust, for the purposes set forth in the will, during the lives of Henry N. Potter and Reynolds P. McAlpine, two infant grandsons of the testator. There is a specific bequest to the decedent's wife of all household furniture, pictures and books; a like bequest of a piano, stool, music and rack therefor, to his daughter, Henrietta; and an annuity of two hundred dollars to his sister.

It further directs the executors to pay all debts and the necessary expenses of the care and management of the estate; to pay to his said wife and to his daughters, Mrs. Mary E. Hart and Mrs. Susan P. McAlpine, each, one sixth of the net annual income of his estate; and to his son, Alfred B. Potter, semi-annually during his natural life, so much of one sixth of the net annual income of the estate as shall be necessary to maintain and support his family and educate his children. The surplus of Alfred's one sixth share of the income of the estate is directed to be accumulated, and his proportionate part thereof paid over to each of said Alfred's children, as they

successively arrive at the age of twenty-one years. The payment to the testator's children of their respective shares of the income of the estate, is directed to cease upon the death of the survivor of the two grandsons upon whose lives the trust estate is limited, but to each of his own children who may survive the said grandsons is bequeathed absolutely the sum of fifteen thousand dollars, except to Charles, whose right thereto is dependent upon the condition in the sixth subdivision.

The wife of the testator died before him, and the will provides that, in such case, the net annual income shall be divided into five equal parts, and each child shall have the same right in and to one fifth, as had been before given in the several one sixth shares. Upon the death of the survivor of the two grandsons aforesaid, or after the decease of all the children of the testator, though said grandsons shall still be alive, the executors are directed to close up and distribute the entire estate, share and share alike, among the grandchildren of the testator; the children of any deceased grandchildren to receive their parents' share. Power to lease and sell real estate, and to invest and manage the whole estate, is conferred upon the executors.

The codicil of July 8th, 1881, bequeathed the sum of $15,000 to various benevolent and charitable institutions in the city of Rochester. The one dated September 13th, 1882, directs the omission, from the assets of the estate, of a certain parcel of real estate conveyed to Mrs. McAlpine. The last codicil, dated August 17th, 1883, changes the number of executors,

and names certain other persons who shall act as such in certain contingencies. It also contains this clause, viz: "I further order and direct that my executors and trustees, mentioned in my said will and this codicil, shall not be required to make any bond or give any security as such executors and trustees of my said will and estate, nor shall my executors and trustees be obliged or compelled to file with the Surrogate any inventory of my estate."

The last clause, relating to the non-filing of an inventory, is challenged by the answers herein as illegal and void. The material parts of the subdivisions attacked for invalidity, are as follows:

"Sixth—Pay to my son, Charles B. Potter, one thousand dollars of the income of my estate, annually, in semiannual payments of five hundred dollars each, if that sum, $1,000, does not exceed annually one sixth of the net annual income of my estate; if it does, then pay him only one sixth of the net annual income of my estate during his natural life . . . . . This one thousand dollars is intended for the support and education of said Charles' children, and to be deducted from his share of the income of my estate. If one sixth of the net annual income of my estate . . . . . amounts to more than one thousand dollars, invest the excess and the accumulations thereof as a separate investment, until my said son Charles shall not live with, or at any time contribute in any manner to the support or maintenance of his present wife, Jennie W. Potter; if he does not live with, or at any time, or in any way, contribute to her support or maintenance, then pay to him his full share—one

sixth of the income of my estate, and all accumulations that may have been held as aforesaid of his one sixth share of the income of the estate; and also from that time pay to him one sixth of the net annual income of my estate in semiannual payments, deducting the rental value of" certain specified real estate.

"*Ninth*—Pay to my said daughter, Henrietta, semi-annually, as much of one sixth of the net annual income of my estate as shall be necessary to support her respectably during her natural life . . . . . If she marries and has a child or children, give to her an additional amount; if there shall be enough of the balance of said one sixth of said income sufficient to support and educate such child or children, pay to her, said Henrietta, as much of said balance as my executors shall deem necessary for that purpose, invest the balance of said one sixth of the said income of my estate and its accumulations, and divide and pay her child, or children, as heretofore directed and provided in the case of my son, Alfred B. Potter's children, whatever said surplus and its accumulations shall amount to at her death; if she shall have no child, or children, add the same to the assets of my estate and treat as part of my estate."

It would be idle for me to profess to be unaware of the fact that, in the community in which the decedent had so long dwelt and in which he was so widely known, a public interest has been manifested in this contest over his will and its results.    Both parties have had their adherents and advocates.

It was urged upon the argument, for the contestants, that the will was a mean, unjust and inequitable one,

in withholding the absolute ownership of the decedent's property from his own children, and in its unequal provisions for them; and it was further said that public sentiment and the moral sense of the community condemned the instrument and its author. To this it was correctly and appropriately replied, that public sentiment may be properly urged to influence the law makers, the legislature, but that it can have no effect with those whose sole duty it is to administer. the laws as they find them; and that it was not an unusual thing for men who have accumulated large fortunes, to endeavor to entail their property so far as the law permits.

It is the duty of courts of Probate to guard carefully the testamentary privileges which the law confers upon the citizens of the land, and at the same time to see to it that the rights of the heirs and next of kin of decedents, under the statutes of descent and distribution, shall not be swept away by alleged wills made by their ancestor, when so much enfeebled in intellect as to be incapable of exercising sound reason and judgment, or when so unduly influenced by another as not to be free to act according to his own inclination or desire. I shall endeavor, therefore, in the consideration of this matter, to be governed only by the evidence herein and by the law applicable to the case.

In the law of wills there are two principles firmly established by the authorities, which should be distinctly borne in mind, viz. :

*First.* Every man, under the conditions and in the manner prescribed by law, has the right to make a

will and dispose of his property in such way and to such persons as shall be most pleasing to him, however absurd, unjust or inequitable the disposition may appear to others. He may do what he will with his own (Clapp v. Fullerton, 34 *N. Y.*, 190; Seguine v. Seguine, 3 *Keyes*, 663–671; Reynolds v. Root, 62 *Barb.*, 250; Wood v. Bishop, 1 *Dem.*, 512). For example, he may give all his property to strangers and thus disinherit his relatives. He may exclude his children or divide his estate among them unequally; and this general power of disposition he possesses down to the last hour of conscious, intelligent existence (Hollis v. Drew Theological Seminary, 95 *N. Y.*, 166; Horn v. Pullman, 72 *id.*, 269). He is not prohibited indulging, in this regard, his passions, his prejudices or his caprices, and his will is not to be disregarded by the judgment of any tribunal, whether of law or equity, because his dispositions are by them deemed unreasonable, or prompted by passion, prejudice or unworthy motive (Marvin v. Marvin, 3 *Abb. Ct. App. Dec.*, 192).

*Second.* The sanity of every man and his capacity to make a will are to be presumed until the contrary appears, and the burden of proving mental disability is on him who asserts it (Delafield v. Parish, 25 *N. Y.*, 9; Brown v. Taney, 24 *Barb.*, 583; Ean v. Snyder, 46 *id.*, 230; Jackson v. Van Dusen, 5 *Johns.*, 144; Miller v. White, 5 *Redf.*, 320).

I shall now take up the specific objections to the probate of these instruments in the following order:

*1st.* The question of the execution of the alleged will and codicils.

The due and proper execution of the several instruments presented for probate was satisfactorily proved. The alleged will and the several codicils thereto were each brought by the decedent in person to the offices of the Traders National Bank in the city of Rochester, and there signed by him in the presence of the subscribing witnesses; each instrument was duly published according to its nature, and the attesting witnesses subscribed the same in the presence of each other, and of the testator. One witness to each paper testifies positively to the observance of all the requirements of the statute in each instance, and while the other one does not recollect all of the details of the occurrence, yet he does not testify in any wise against the execution. The attestation clause in each case is full and complete. The signatures are all genuine. On some, if not all, of these occasions, the attestation clause was read over by the decedent to the witnesses. "The failure of recollection of the subscribing witness to a will, as to what occurred at the time of signing, will not defeat the probate thereof, if the attestation clause and the surrounding circumstances establish its execution" (Rugg v. Rugg, 83 *N. Y.*, 592; Matter of Will of Cottrell, 95 *id.*, 329; Lane v. Lane, *id.*, 494; Whitefield v. Whitefield, 19 *Week. Dig.*, 3–6; Kinne v. Kinne, 2 *T. & C.*, 391).

*2d.* The question of testamentary capacity.

A strenuous effort was made by the contestants to prove that the decedent was insane, and lacking in testamentary capacity, at the time of the execution of the alleged will and codicils. A number of medical experts were examined, including one or two

alienists of high repute in their profession, who gave
it, as their opinion, that the decedent was of unsound
mind ; and considerable testimony was adduced tend-
ing to show that there had been such an enfeeble-
ment of his mental and bodily powers, during the
last three or four years of his life as to produce
unsoundness of mind, which the contestants claimed
took the form of melancholia, delusion and senile
dementia.   The sum of the evidence on this subject
was that the decedent, who was an old man, had
grown crabbed, irritable, morose and petulant in his
manner; that he was forgetful and of failing mem-
ory; that there was a tremulousness in his hands and
head; that at times he exhibited great and unrea-
sonable fear of personal violence and robbery when
apparently in no actual danger; that he was ex-
tremely close, stingy, niggardly and penurious in
pecuniary matters; and that he had formerly made
wills disposing of his property in quite a different
manner from that directed in the present will.

It is scarcely necessary to say that all the testi-
mony, tending to support the points set forth in the
foregoing summary, might be given its greatest
weight, and yet fall far short of establishing unsound-
ness of mind in the decedent.   " By a sound mind,
within the meaning of the law, is not meant a mind
which is perfectly balanced and free from all preju-
dice or passion" (Phillips v. Chater, 1 *Dem.*, 533).
A will is not to be set aside merely because its maker
was weak, or sometimes foolish, or lacked the average
mental capacity of his neighbors, or did not dispose
of his property as others, who know nothing of his

reasons, might think he ought to have done (Rice v. Rice, 50 *Mich.*, 448). Failure of memory, being a natural attendant upon age, will not incapacitate an aged person from making a will (Reynolds v. Root, 62 *Barb.*, 250; Pilling v. Pilling, 45 *id.*, 86–95; nor does morbid avarice, or senility or physical weakness (Cornwell v. Riker, 2 *Dem.*, 354–395). Testamentary incapacity cannot be inferred from an enfeebled condition of mind or body (Horn v. Pullman, 72 *N. Y.*, 269; Children's Aid Society v. Loveridge, 70 *id.*, 387–410). Perverse opinion, violence of manner, ill temper, moroseness, severity, and even brutality are to be distinguished from alienation of mind (Riggs v. American Tract Society, 95 *N. Y.*, 503–513). An unequal or unjust will raises no presumption of unsoundness of mind, nor does radical change from previous testamentary dispositions (La Bau v. Vanderbilt, 3 *Redf.*, 384; Horn v. Pullman, 10 *Hun*, 471; affi'd, 72 *N. Y.*, 269; McLaughlin v. McDevitt, 63 *id.*, 213).

The importance to be attached to many of the above mentioned indications of the failure of the decedent's mental and bodily powers depends upon the extent to which these infirmities had advanced and the manner of their manifesting themselves; if the failure of memory extended to important business affairs and transactions, as well as to trivial matters; if the change of manner from cheerfulness and affability to moroseness and discourtesy was shown alike to intimate friends and ordinary acquaintance; if the penuriousness and avarice had recently supplanted open-handed generosity; if great physical

strength and courage had given way to excessive timidity and feebleness, and business capacity and sagacity to folly and blundering in the management of business affairs, there would then be ample warrant for holding that the testator was no longer competent to make a will.   I do not find the evidence that these hypotheses are true.

Mr. Potter, until within a week from his death, was the sole manager of his large estate.   He gave personal supervision to all his affairs, made profitable investments of his funds, and retained to the last that business shrewdness which had made of the poor clerk a millionaire.   He was slight of frame and of a nervous temperament, and probably had never been a man of much physical courage.   He was always close and parsimonious in the extreme, and while in the latter part of his life he was less affable and courteous than formerly to some people, yet, to many others, he always showed his old-time civility and courtesy.

Many witnesses,—prominent bankers, merchants, business and professional men of Rochester, old friends and acquaintances of Mr. Potter, testified to these things, and said that the decedent, to nearly the close of his life retained all his faculties to a remarkable degree for one so old; that he was active, energetic and shrewd in business to the last; that he took an intelligent interest in public and municipal affairs, and also in social and economic questions; and that his acts and conversation were entirely rational.

Much stress was put upon the assumed change in the decedent's testamentary intentions.   Some evi-

dence was given to show that, about twenty years before his death, and again some ten years later, Mr. Potter had said that he intended his family should all share alike in his property. It is enough to say, in regard to this statement, that the decedent never seems to have entertained such an intention at any time when he actually made and executed a will. Every will of which we have any account discriminated against his son Charles, and gave little or nothing to him absolutely. The will drawn by Mr. McGuire in August, 1879 (excepting the disposition of the homestead and household furniture), gave to none of the testator's children an absolute estate in any of the property, but only an equal share in the income thereof. That will was based upon one drawn by Mr. Cochrane and, therefore, the Cochrane will probably contained similar limitations upon the rights of enjoyment, given to the decedent's children. Mr. May's recollection of the contents of the proposed will shown to him are too indefinite to afford any satisfactory evidence of its contents. It does not seem, therefore, that the will now under consideration differs so radically from any other actually executed, or from any intention previously entertained, as to arouse suspicion of aberration of mind in the maker thereof. "A change of intention is of no importance if there be a sound mind, unconstrained" (Titlow v. Titlow, 54 *Penn.*, *St.* 216). "A testator has a right to change radically and arbitrarily the manner of disposing of his property, and, in the absence of fraud, courts will sustain his action in this respect" (McLaughlin v. McDevitt, 63 *N. Y.*, 213).

The soundness of mind of the decedent and his capacity to execute a will are further assailed by medical experts who state no facts, but give their opinions upon facts already in proof, or assumed to be true for the purposes of the examination.   The present system of presenting the testimony of experts, in the courts, is poorly calculated to assist in arriving at the exact truth.   The expert produced as a witness has almost invariably given assurance that he will swear to an opinion favorable to the party calling him, and for this he usually receives a fee proportioned to his estimate of the value of his opinion to the side for which he testifies (Templeton v. People, 3 *Hun*, 357, 361).   The experts are frequently men who never knew, or even saw the decedent.   They base their opinions upon a few detached circumstances in his life, generally grouped together in the form of hypothetical questions, which magnify or exaggerate the facts and circumstances to which they call attention.

" Isolated incidents in the life of intelligent, educated and cultured people, can be so grouped together as to make the most sane of men appear to have been mentally unsound, and, in order to a wise and safe judgment, the isolated incidents usually presented to experts need to be supplemented by a statement of the general character, conduct and habits of the person " (Dickie v. Van Vleck, 5 *Redf.*, 284–299).

In the present case, while I credit the physicians, who pronounced Mr. Potter of unsound mind, with honestly entertaining that conviction, I am obliged to dissent entirely from their opinion, which, in my

judgment, is founded upon wholly insufficient and inadequate data, and upon assumptions of the existence of facts which, in my opinion, were not established. Among other things, they assume that the fear exhibited by the decedent on several occasions was wholly groundless. Mr. Potter, in two instances, said that the men, who were the objects of his alarm, had threatened to kill him. We are bound to believe that he told the truth, since there is no proof of the contrary, and especially as there is corroborative evidence of the threat in each case. His fear, therefore, though excessive, was not imaginary. In the only other case in which this undue fear was shown, the decedent had a considerable sum of money with him, and there was a "big fellow" near who might have attacked him, if wicked and malicious enough so to do, though there was probably no real danger. These several exhibitions of fear the contestants' experts pronounced to be delusion; but I do not so understand the term.

"An insane delusion is one which not only is founded in error, but is without evidence of its truth, and often exists against the clearest evidence to the contrary. Its essence is that it has no basis in reason and cannot be dispelled thereby" (Merrill v. Rolston, 5 *Redf.*, 220, *and cases cited on p.* 252; Seamen's Friend Society v. Hopper, 33 *N. Y.*, 619). But even if it were conceded that in this particular the decedent was laboring under delusion, it is difficult to see how that fact could in any wise affect the validity of his will. "A person under delusion, or a monomaniac, may make a valid will, if the delusion

which affects the general soundness of his mind has no relation to the subject, or object, of the will, or the persons who would otherwise be likely, ordinarily, to be the recipients of his bounty" (Lathrop v. Am. Board of Foreign Missions, 67 *Barb.*, 590–595; 1 Redf. on Wills, 79; Children's Aid Society v. Loveridge, 70 *N. Y.*, 387; Riggs v. American Tract Society, 95 *id.*, 503; Fraser v. Jennison, 42 *Mich.*, 206–238). A number of the most learned and highly respected physicians of this city, who had known Mr. Potter well for many years, testified that they did not consider him of unsound mind; and that they never saw anything singular or unusual in his manner or conduct; and with them, on this question of sanity, I agree, upon all the evidence in the case.

The formal execution of these instruments, and the competency of the testator having been established, it now remains to consider the validity of the directions for the accumulation of income contained in the foregoing sixth and ninth subdivisions of the will. The answers of the contestants expressly allege the invalidity of the accumulation therein provided for; and I am, therefore, required, by § 2624 of the Code of Civil Procedure, to determine the question raised as to the personal property.

The *sixth* subdivision of the will makes the enjoyment by Charles B. Potter of his one fifth part of the income of the estate, conditional upon his not living with, or in any manner contributing to, the support or maintenance of his wife, Jennie W. Potter. This is an attempt, on the part of the decedent, to carry out a threat made by him many years ago, to punish

Mrs. Charles B. Potter for daring to interfere in some business transactions between him and her husband. The testator was a self-willed man, intolerant of opposition, accustomed during all his life to exercise a patriarchal control over his children and their affairs. Mrs. Charles B. Potter, a refined and cultivated woman, of independent character and judgment, soon after her marriage with his son came into conflict with her father in law in various ways. He resented what he evidently considered an unwarrantable interference with his paternal sovereignty; and a mutual dislike sprang up which continued during the life of Mr. Potter, the elder, and became so strong that Mrs. Potter forbade her children to visit the house of their grandfather.

No one will justify the attitude of hostility which the testator took toward the wife of his son, nor his attempt to carry into effect his threat to punish her through his will; but it is easy to see why a man, such as this testator was, should make the endeavor to gratify his desire for revenge.

This condition is illegal and void. It requires the violation of the laws of the State, and if complied with would render Mr. Charles B. Potter liable to imprisonment in the county jail (Code Crim. Pro., §§ 899–904). It is, also, contrary to public policy and good morals. The condition is evidently precedent in its character, and while, at the common law, it would doubtless work a forfeiture of the gift, yet in equity and under the civil law, though the condition is void, yet the gift is good. "With respect to legacies out of personal estate, the civil law, which

in this respect has been adopted by courts of equity, differs in some respects from the common law in its treatment of conditions precedent; the rule of the civil law being that, where a condition precedent is originally impossible . . . . . or is illegal as involving *malum prohibitum*, the bequest is absolute, just as if the condition· had been subsequent" (2 Jarman on Wills, 5*th Am. ed.*, 12, 13 ; 2 Williams on Ex'rs, 6*th Am. ed.*, 1372). " When the illegality of the condition does not concern anything *malum in se* but is merely against a rule or the policy of the law, the condition only is void, and the bequest single and good" (1 Roper on Legacies, 757).

The law regards with favor the marital relation and frowns upon the attempts of individuals to sever or interrupt it. In Tenant v. Braies (*Tothill*, 78), there was a bequest, made to the daughter of the testator of a sum of money, " if she will be divorced from her husband." The gift was held good, but the condition void. In Brown v. Peck (1 *Eden's Ch.*, 140), a testator directed his executors to pay to his niece, Rebecca, " if she lived with her husband, £2 per month and no more, but if she lived from him and with her mother, to allow her £5 per month." The condition was held to be *contra bonos mores*, and the legacy of £5 per month simple and pure. In Conrad v. Long (33 *Mich.*, 78), one half of the testator's real estate was devised to his sister, Elizabeth, " if at any subsequent time she should conclude not to live with her present husband, Henry Long, as his wife. But if she did continue to live with him, then to the testator's brother." It was held that she took

the estate clear of conditions.   See, also, Cooper v.
Remsen (5 *Johns. Ch.*, 459–463).

The same result is reached in another way, as sug-
gested by the learned counsel who appeared in sup-
port of the probate, as special guardian of certain
infants, viz. :  The direction to accumulate is void,
whether as to income of personal or real property
(1 R. S., 726, §§ 37, 38 ;  and id., 773, § 3).

The said direction, being unlawful and void, should
be regarded as stricken out of the will (Williams v.
Williams, 8 *N. Y.*, 525–563 ; Pray v. Hegeman, 92
*id.*, 508).   Section 2 of 1 R. S., 773, makes § 40 of 1
R. S., 726, applicable to accumulations of personal
property as well as to rents of realty ;  and the accu-
mulations of income, therefore, belong to the persons
entitled to the next eventual estate (Cook v. Lowry,
95 *N. Y.*, 103).

" Those who presumptively will be entitled to re-
ceive the rents and profits " (and income), " when the
period of accumulation ends, are entitled to anticipate
the event which is to terminate the accumulation, and
to take at once what is unlawfully directed to be ac-
cumulated " (Manice v. Manice, 43 *N. Y.*, 303–389).
Charles B. Potter is the person entitled to take the
accumulations, and one fifth of the annual income,
upon the happening of the event which terminates
the accumulation, viz. :  his ceasing to live with or
support his wife, and he is, therefore, entitled to the
same at once and absolutely, the direction to accu-
mulate being void (Pray v. Hegeman, 92 *N. Y.*, 508).

That portion of the sixteenth subdivision of the
will is also void, which in substance excludes Charles

B. Potter from the bequest of $15,000 to each child of the testator surviving the grandchildren, Henry N. Potter and Reynolds P. McAlpine, unless he shall have previously become entitled to receive his one sixth by abandoning and not supporting his wife. If he shall survive said grandchildren, he will be entitled to the said $15,000, absolutely.

The directions for the accumulation of such part of the income of one fifth of the estate as should not be expended for the support of Miss Potter, the unmarried daughter, contained in the ninth subdivision of the will, is wholly void. It is not for the benefit of any minor in being at the time of the testator's death (1 R. S., 773, § 3). So long, therefore, as Miss Potter remains unmarried and without issue, the surplus income will belong to those entitled to the next eventual estate (Cook v. Lowry, *supra*). It vests, therefore, in the grandchildren of the testator living at his death in equal shares, subject to open and let in after-born grandchildren who may come into existence before the final distribution of the estate (Monarque v. Monarque, 80 *N. Y.*, 320–326; Kilpatrick v. Johnson, 15 *N. Y.*, 322, 327).

An executor is required by law within a reasonable time after qualifying, with the aid of appraisers, to make a true and perfect inventory of all the goods, chattels and credits of his testator (2 R. S., 82, § 2). This inventory shall be filed with the Surrogate within three months after the issue of letters. If this is not done, he may be compelled, on the application of a creditor, or person interested in the estate, to perform such duty; and in case of default he may be

committed to jail (Code Civ. Pro., §§ 2715, 2716). In actions and special proceedings, the inventory is presumptive evidence of the amount and value of the estate both for and against the executor. It would often be extremely difficult, if not impossible, to prove what property came into the possession of an executor if he were excused from making and returning an inventory thereof. If the executor converts to his own use, makes away with or fraudulently withholds any of the money or property of the estate, he is guilty of embezzlement (L. 1877, ch. 208). If a testator can dispense with the making of an inventory by will, many of the safeguards thus thrown around the estate which comes to the hands of the executor would be thrown down, and fraud and misappropriation of the trust property would be rendered much easier and less liable to detection than at present. It is against public policy to permit such interference with the forms of procedure established by law, or to remove the barriers designed to protect estates from misappropriation. The safety, preservation and honest distribution of decedent's estate require that provisions like the one in question should be declared invalid and of no effect.

As the testator's general plan for the distribution of his estate will be but slightly interfered with by this decision, it will not be necessary to inquire what should be done if it had been seriously broken in upon. The will and codicils, therefore, must be admitted to probate, except the parts herein declared invalid, and a decree in conformity with this opinion may be settled on two days' notice to parties interested.