ANNA KNAPP, Appellant, v. ST. LOUIS TRUST COMPANY et al.

Division Two, December 4, 1906.

1. **WILL CONTEST: Question for Jury.** A suit to set aside a will, bottomed on the incapacity of the maker, is a suit at law, in which the contestants are entitled to a jury if there is any substantial evidence tending to prove that the maker did not have sufficient mental capacity to execute a will.

2. ———: **Character of Attesting Witnesses.** In all cases the attesting witnesses to a will are, by law, placed around the testator as a guard to protect him from fraud, imposition and undue influence, and to judge of his capacity. In the case of a very aged person, they should be those who have for considerable time been acquainted with him.

3. ———: **Proof of Incapacity.** Testimony of the mental incapacity of the testator should come, as far as possible, from those persons who have had extensive opportunity to observe his conduct, habits and mental peculiarities extending over a considerable period of time, and reaching back to a period anterior to the malady.

4. ———: **Testamentary Capacity: Meaning.** Testamentary capacity means that the testator, at the time of the execution of his will, should have sufficient understanding and intelligence to transact his ordinary business affairs and to understand the nature and character of his property and the persons to whom he is giving it.

5. ———: **Incapacity: Evidence.** Extreme debility from old age, a radical change in the mental employments of the testatrix following a stroke of paralysis received before the will was made, softening of the brain thereafter, appropriation of things which did not belong to her, mental delusions of the presence of visitors in her room and of conversations with her deceased husband, repudiation of ordinary contracts with her agents, inability to talk coherently and to confine her conversation to the business matter in hand, coupled with a disregard of

the rules of health and cleanliness, and other things indicating senile dementia, are evidence of testamentary incapacity; and when shown by the testimony of her daughter with whom she lived, her grand-children or others long associated with and close about her, are sufficient to take the case to the jury.

6. ———: ———: **Change in Habits: Insanity.** A marked change in the habits and thoughts of testatrix is evidence of mental unsoundness. Insanity is indicated by proof of acts, declarations and conduct inconsistent with the character and previous habits of the testate.

7. ———: ———: ———: **No External Cause.** Evidence for the contestant tending to show that a generous, dainty, refined and intelligent woman of good business capacity, had, in the last ten years of her life, towards the close of which she made a will, become utterly untidy in her habits and person, penurious, and had lost her memory and business capacity, and was in many respects strikingly different from herself of previous years, the change not being attributable to anything in her external life and surroundings, is evidence bearing on her capacity to make a will.

8. ———: **Insane Delusion: Imaginary Property.** Whenever a testator conceives something extravagant to exist, which has in fact no existence whatever, and he is incapable of being reasoned out of this false belief, it constitutes insanity; and if this delusion be in regard to his property he is incapable of making a will.

9. ———: ———: ———: **Prior Gift to Child.** The will recited that testatrix had previously given to a daughter twenty thousand dollars, and for that reason alone she gave her nothing more than the net income for life of the trust estate; and the evidence was that she had for years been under the delusion that she had given the daughter that sum, and could not be reasoned out of that belief; whereas, in fact she had never given her daughter anything, but for the greater part of thirty years had lived on her bounty. *Held*, that this fact alone, if established, constituted an insane delusion, and was sufficient to authorize the jury to set the will aside.

10. ———: **Evidence: Account Book of Physician: To What Extent Admissible.** Entries in the account book of a deceased physician who treated testatrix prior to the making of the will, are admissible in evidence when offered by contestant, not only for the purpose of showing that at certain dates he rendered medical services to testatrix, but also for the purpose of showing the disease for which he treated her—in this case, softening of the brain and paralysis.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood,* Judge.

REVERSED AND REMANDED.

*J. M. Blayney, Jr.,* for appellant.

(1) Question presented for decision: Crossan v. Crossan, 169 Mo. 637; Garland v. Smith, 127 Mo. 581. (2) Opinions of witnesses as to the sanity of testatrix: Brooke v. Townshend, 7 Gill. 10; Dunham's Appeal, 27 Conn. 192. (3) General insanity: 1 Wharton and Stille, Medical Jurisprudence (1905), secs. 67, 975, 976, 985, 992; Redfield on Wills, sec. 12, 6; sec. 12, 3; Schouler on Wills, p. 103; Underhill on Wills, p. 117, sec. 92; Rood on Wills, sec. 119; Moore v. McNulty, 164 Mo. 117; Kischman v. Scott, 166 Mo. 214; Appleby v. Brook, 76 Mo. 314; Aylward v. Briggs, 145 Mo. 609; Petefish v. Becker, 176 Ill. 448; Petrie v. Petrie, 6 N. Y. Supp. 831. (4) Insane delusion is evidence of general insanity. 1 Wharton and Stille, Medical Jurisprudence, p. 101; Schouler on Wills, sec. 190, p. 153; 1 Jarman on Wills, p. 102, note; 1 Redfield on Wills, sec. 11; Page on Wills, sec. 108. (5) Insane delusions need not be specifically pleaded: Society v. Price, 115 Ill. 635; Burkhardt v. Gladish, 123 Ind. 327. (6) The will in question is the direct product of an insane delusion: 1 Redfield on Wills, pp. 79, 87; Rood on Wills, sec. 132, p. 68; 1 Wharton and Stille, Med. Jur., pp. 82, 85; Benoist v. Murrin, 58 Mo. 307; Garland v. Smith, 127 Mo. 567; Miller v. White, 5 Redf. 320; Rivard v. Rivard, 109 Mich. 98; Thomas v. Carter, 170 Pa. St. 283; Robinson v. Adams, 62 Me. 369; Lucas v. Parson, 24 Ga. 640; Society v. Hopper, 33 N. Y. 619; In re Jenkins Will, 80 N. Y. Supp. 634; Society v. Price, 115 Ill. 623; In re Segur's Will, 71 Vt. 224. (7) Proponents' evidence: 1 Jarman on Wills, p. 96 note; 1 Redfield on Wills (2 Ed.), p. 106; 1 Wharton & Stille, Med. Jur. (1905), p. 444, n. (8) Errors of trial court in excluding evidence: High-

man v. Ridgway, 10 East 109; Taylor v. Witham, 3 Ch. Div. 605; Greenleaf, Evidence (16 Ed.), sec. 152; Percival v. Uausen, 7 Exch. 1; 16 Ency. Law and Procedure, p. 1218; 4 Wigmore, Evid., pp. 1822, 1828.

*Judson & Green* and *John H. Overall* for respondents.

(1) The test of capacity to make a will is that the testatrix have sufficient mental capacity to understand the nature and character of her property, the natural objects of her bounty, and the disposition she is making of her estate by the will. The law does not require the high degree of intelligence to make a will that is necessary in some other matters. Hamon v. Hamon, 180 Mo. 685; Southworth v. Southworth, 173 Mo. 59; Story v. Story, 188 Mo. 110; Hughes v. Rader, 183 Mo. 630; Crossan v. Crossan, 169 Mo. 631; Crowson v. Crowson, 172 Mo. 691; Sehr v. Lindemann, 153 Mo. 288; Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo. 355; Riggin v. Trustees of Westminster College, 160 Mo. 570; Wood v. Carpenter, 166 Mo. 465. (2) Where there is no substantial evidence that the testatrix does not possess mental capacity to make a valid will, it is the duty of the court to so declare as a matter of law. Sayre v. Trustees of Princeton University, 90 S. W. 787; Catholic University v. O'Brien, 181 Mo. 68; Hamon v. Hamon, 180 Mo. 685; Sehr v. Lindemann, 153 Mo. 288; Fulbright v. Perry County, 145 Mo. 432; Schierbaum v. Schemme, 157 Mo. 1; Martin v. Bowdern, 158 Mo. 379. (3) The mere fact of the feebleness incident to old age imparts no information as to the want of capacity to make a valid will. There was no evidence in this case from which senile dementia could possibly be inferred. Riley v. Sherwood, 144 Mo. 354; Hamon v. Hamon, 180 Mo. 685; McFadin v. Catron, 138 Mo. 197; Watson v. Watson, 2 B. Mon. 74; Von Alst v. Hunter, 5 Johns. Ch. 148. (4) A person may possess an insane delusion and still be perfectly

competent to make a will, provided the disposing party understands the nature and extent of her property and the objects of her bounty. Page on Wills, sec. 107; Thomas v. Carter, 170 Pa. St. 272; In re Cline's Will, 24 Ore. 175; In re Redfield's Estate, 116 Cal. 637. (5) The question of mental capacity may also depend on the extent of the testatrix's property and the manner of its disposition. Trist v. Newell, 62 Ill. 196. (6) The testimony of witnesses that the testatrix at the time of making the will was not capable of transacting business matters, or was otherwise incapacitated, being mere opinions of non-experts, do not tend to show any incapacity. Crowson v. Crowson, 172 Mo. 691; Southworth v. Southworth, 173 Mo. 59; Sehr v. Lindemann, 153 Mo. 276. (7) It is not necessary that the testatrix comprehend the provisions of her will in their legal form. Trist v. Newell, 62 Ill. 196; Kischman v. Scott, 166 Mo. 214. (8) The testimony of testamentary capacity was conclusive, and the court properly directed a verdict.

GANTT, J.—This is an action to contest the validity of the will of Mrs. Margaret Gaffey. The grounds of contest were and are that the testatrix at the time of executing the alleged will was not of sound and disposing mind and memory and was under undue influence. On this appeal the contestant admits that no evidence was introduced in the circuit court tending to prove undue influence, and the sole contention before us is that the circuit court erred in giving a peremptory instruction to the jury to find the paper writing propounded to be the last will and testament of Mrs. Gaffey. The will in contest contains the following provisions:

1. Payment of debts. Direction for cremation of body and burial of ashes in Bellefontaine Cemetery in grave of testatrix's deceased sister.

2. $100 to Lester Thacker Knapp.

3. $100 to Georgia Knapp.

4. I have already given to my daughter, Anna, personal and real estate to the amount of twenty thousand dollars, and I make no further provision for her, except the income from the trust estate referred to in the next paragraph.

5. All the rest and residue of her property to St. Louis Trust Company, "with full power in said trustee to invest, sell and re-invest any part of said estate, including the power to sell the real estate and pass a full legal title thereto whenever, in the judgment of said trustee, it shall be necessary or proper to do so. After paying the necessary expenses for the care, protection and management of said estate, the said trustee shall pay the entire revenue, derived therefrom, to my said daughter Anna, in quarterly or semi-annual installments, during her natural life." Upon the death of said daughter, then the balance of said trust estate to go:

a. Three hundred dollars to the then acting Episcopal Bishop of Missouri, for diocesan missions.

b. Two hundred dollars to St. Luke's Hospital (Episcopal).

c. "To my nephew, Edward St. John, now residing in New York, if living, the sum of five hundred dollars." If not living, to his daughter, Edna; if said daughter, Edna, be not living, then to Lester Thacker Knapp, and his lawful heirs.

d. Five hundred dollars to "my cousin, George W. Groves, of the city of St. Louis, if living," if not living, said sum to be paid to Georgia Knapp.

e. After making the above payments, the residue of said trust estate to be distributed as follows: Two-twelfths to testatrix's grandson Ralph Hammond Knapp; five-twelfths to testatrix's granddaughter, Georgia Knapp; and five-twelfths to testatrix's grandson, Lester Thacker Knapp.

f. St. Louis Trust Company is named executor.

The will was signed by Mrs. Gaffey and witnessed by F. V. Dubrouillet and B. W. McIlvaine.

The only answer filed on the part of any of the defendants was by the St. Louis Trust Company, which admitted the death of Mrs. Gaffey, the probate of the will, the fact that the Trust Company was named trustee and executor, and that the plaintiff, Anna Knapp, was one of the beneficiaries under the will, but denied all other allegations of the petition. The cause was tried in the circuit court of the city of St. Louis on the 17th of November, 1903, and at the close of all of the evidence in the case, the court of its own motion directed the jury to find that the said paper writing was the last will of Mrs. Margaret Gaffey. To that instruction the plaintiff duly excepted. Within due time a motion for new trial was filed by the plaintiff, which was overruled, and the plaintiff by proper steps perfected her appeal to this court. As the only question presented on this appeal is whether the plaintiff introduced substantial evidence tending to prove that at the time of the execution of said will, Mrs. Gaffey was not of sound and disposing mind and memory, it is essential to make a summary of the testimony introduced on the trial on the part of the proponents, and contestants.

Mr. F. V. Dubrouillet testified that he was trust officer of the St. Louis Trust Company; was such in November, 1898, at the time of attesting the will of Mrs. Gaffey, and had been for six or seven years; he knew he attested the will from examining his signature, but he did not recall the circumstances; attested at the request of Mrs. Gaffey; had not known her before; did not remember where the attestation took place, but thought it must have been in the office of the trust company; thought testatrix was of sound mind. On cross-examination he stated that he had no distinct recollection of the transaction; thought it was the first occasion on which he had seen Mrs. Gaffey; would not know who was present except by seeing the signatures to the will;

transaction did not take over five or ten minutes; facts left no impression on his mind; knew that he signed at the request of the testatrix, because he never signed a will unless asked by the person making the will; could not state whether or not the request was made by Mr. Orr and repeated by Mrs. Gaffey; did not remember how Mrs. Gaffey appeared, or what kind of a looking person she was; made no inquiry about Mrs. Gaffey's mental condition; that it was the only opportunity witness had of judging of her soundness of mind; did not know that he would regard that as a fair test of judging a person's sanity. On re-examination he stated that from the fact of his attestation he was satisfied that testatrix was at the time of the attestation determined by him to be of sound mind.

Benjamin W. McIlvaine testified that he had no particular business in November, 1898, and was not connected with the St. Louis Trust Company; that it was his signature to Mrs. Gaffey's will; that Mrs. Gaffey signed in his presence; that he did not know Mrs. Gaffey before that time; that it was his opinion that Mrs. Gaffey was of sound mind, or he would not have signed the will.

On cross-examination he testified that he had no distinct recollection of signing the will and the only thing which recalled the circumstance to him was the will itself and his signature; the transactions took about five minutes; was not sure who was present but thought Mr. Orr must have been there; thought the will was handed to him by Mr. Orr; asked testatrix, "Do you want me to sign this will?" Request was not volunteered by testatrix; had never seen Mrs. Gaffey before and carried on no further conversation with her; if he had had the faintest thought that the woman was not sane he would not have signed the will; believed that she was sane so far as he could see; had forgotten the case entirely except as to those things which were his invariable practice.

Isaac H. Orr testified that he had been trust officer of the St. Louis Union Trust Company for seven years, and held that position in November, 1898, and had been for thirteen years a member of the St. Louis bar; had never transacted any business, nor had any personal acquaintance with Mrs. Gaffey before she was brought to him for the purpose of making her will; she was brought to his office and introduced to him by Mr. Mitchell, or by one of the tellers, but thought it was by Mr. Mitchell, and introduced to him as one of the customers who wanted to make a will; had Mrs. Gaffey sit down in his office and had a conference with her. She told him she wanted to make a will and told him in a general way what her property was, but not its value, as he now recalls it; she told him where she lived and about her daughter and her daughter's children and the other parties named in the will; she told him how she wanted to dispose of her property and he made a pencil memorandum of what she wanted to do; she told him especially that she wanted to provide for her daughter and wanted it so her daughter or her family could not dissipate it, so that her daughter would have an income when she got old; she wanted her daughter's children to have the benefit of her estate after her daughter died; she told him she had already expended a great deal of money and property on account of her daughter and wanted that fact stated in the will, and that she felt that her daughter would not conserve her property if she got it so she could dispose of it; had a very full conversation with her about these matters, which lasted not less than a half hour and probably an hour; he told her he would prepare the will and made an appointment with her to come back and look it over; he got the names of all the parties named in the will from Mrs. Gaffey and the amount Mrs. Gaffey wished to give in each case; he took down the items and explained to Mrs. Gaffey about the provisions to her daughter; that it was the only way in which the estate

could be preserved; at least, that was his suggestion to
her as to how she could do it; she wanted the trust com-
pany to act as trustee, no one else was present at the
interview; her conversation was perfectly clear, and
there was nothing to indicate that she did not know what
she wanted and how she wanted it done; he had no dis-
tinct recollection as to her personal appearance except
that she was an old lady; never saw her after the will
was drawn and would not recognize her if shown a pho-
tograph of her; he had a distinct recollection of the
conversation in reference to the will and remembered
that she was an old lady who, to his mind, understood
what she wanted; she was very clear as to what she
wanted and made the impression on him that she was
making wise disposition of her property; he then pre-
pared the draft of the will. Mrs. Gaffey returned in
two or three days and he gave her the draft, typewrit-
ten, to read over; there was a little office across the hall
which was given to Mrs. Gaffey in which to read the
will; the draft as executed was the final draft prepared
by him; had no distinct recollection about Mrs. Gaffey
making changes in the original draft of the will, but his
impression was she made some slight change, but he
was not clear about that; Mrs. Gaffey impressed him
as being entirely capable to transact the business that
she was about; he had no knowledge or information in
regard to the beneficiaries named in the will except as
received from Mrs. Gaffey. On cross-examination he
testified that he had no recollection of Mrs. Gaffey's
personal appearance; no charge was made for drawing
Mrs. Gaffey's will; he would not say that Mrs. Gaffey
suggested a change in the will, although such was his
impression; that he got that idea because his impres-
sion was that Mrs. Gaffey sat in his office while he had
something done to the will; could not say positively
that Mrs. Gaffey did not adopt the draft as originally
prepared by him; he did not see her read the will, but
would say that she said she read it; he does not recol-

lect having read it to her; thought that Mrs. Gaffey did not have the data written on a piece of paper when she came to his office; would not state positively that she did not, but would state positively that he took down the data; had a distinct recollection that it was a subject of considerable conversation; he did not suggest to her to send for any member of her family; the will was kept at their office after it was executed.

Witness was not allowed by the court to answer the question as to whether or not Mrs. Gaffey was cremated as provided in the will, to which ruling the plaintiff duly excepted.

On redirect-examination he stated that there was nothing about the woman that suggested to witness that she was not entirely capable of making a will, and, in fact, her disposition of the property met with the approval of the witness; he thought she was making a rational will.

On recross-examination he testified that the statement that testatrix had given her daughter personal and real estate to the amount of twenty thousand dollars as it appeared in the will, was inserted at the request of Mrs. Gaffey.

L. S. Mitchell testified that in November, 1898, he was paying teller with the St. Louis Trust Company and remained in their employ until the 15th of December, 1901; was for a number of years receiving teller for the St. Louis Trust Company, and as such made the acquaintance of Mrs. Gaffey; she made deposits with him for several years; but could not say just how long; had no distinct recollection of introducing Mrs. Gaffey to Mr. Orr in the matter of making her will; could not state that she ever mentioned making a will to him and did not recollect any of the circumstances of her going to Mr. Orr for that purpose definitely enough to make oath to it.

Having offered the foregoing evidence and the will of Mrs. Gaffey, the proponents rested. The plaintiff,

the contestant herein, introduced evidence tending to prove the following facts: Mrs. Gaffey, the testatrix, was born in 1821. She had two children, a son, who died before the time touched upon by the evidence in this case, and a daughter, Anna, Mrs. Knapp, the contestant. Mr. Gaffey, the husband of testatrix, died before the happening of any of the events with which we are concerned. Prior to the year 1873 the testatrix and her daughter, Mrs. Knapp, lived on Olive street in St. Louis, with Mrs. Gaffey's sister; about that year the plaintiff married Mr. Pybus, and Mrs. Gaffey at once went to live with Mr. and Mrs. Pybus. At that time Mrs. Gaffey had no estate. She continued to live with Mr. and Mrs. Pybus until the death of Mr. Pybus in 1883, when Mrs. Gaffey, together with Mrs. Pybus and her three children, Georgia, Ralph and Lester, again took up her home with Mrs. Gaffey's sister on Olive street. After about three years Mrs. Pybus married Mr. Knapp, and Mrs. Gaffey, the testatrix, again made her home with her daughter, Mrs. Knapp, where she remained until her death in 1901. For over thirty years Mrs. Gaffey lived with her daughter, with the exception of the three years that she lived with her sister. During this entire period Mrs. Gaffey paid no board and contributed nothing towards the expenses of the household. The relations between Mrs. Gaffey and her daugter, Mrs. Knapp, were of the most affectionate kind. Mrs. Knapp made all the clothing, even the bonnets worn by her mother. Within a few years prior to 1890 Mrs. Gaffey's sister died and left her the estate, which is the subject of the present contest. Up to 1890, the testimony tends to show, the testatrix was an intelligent, refined woman of good education and dainty in her habits and person. She was generous with the little means that she had. Shortly after the death of her sister, the testimony tends to show that Mrs. Gaffey became childish and would drive around in a child's

pony cart, and would collect bits of coal and sticks, which she would bring home.

In January, 1890, Mrs. Gaffey's physician began to treat her for the softening of the brain, which treatment was continued up to the time of her death.

In 1895 Mrs. Gaffey's brother-in-law, Mr. Thacker, who was living in Mrs. Knapp's home, died. Mrs. Gaffey would not allow them to call in a physician until it was too late. Mrs. Knapp testified that her mother was acting in such a way that to have called a doctor against her mother's wishes would have resulted in making her private affairs public to the neighbors. Mrs. Gaffey conceived the idea that her brother-in-law was out of his head. The old gentleman sent for Mr. Belding, one of his old friends, and Mr. Belding testified Mrs. Gaffey would not allow him to go into the room, but one of her grand-children led her away and Mr. Belding went in and found the old gentleman perfectly clear in his head. Mrs. Gaffey would come into the room unannouced while he was there and "act in a queer sort of a way, different from anybody sound-minded would act."

From that time on the change in Mrs. Gaffey's mental condition became more marked. In 1897 Mrs. Gaffey had a spell at the home of Mrs. Weiting which lasted for ten minutes, during which time she was unconscious. She afterwards had two lighter spells at the same home.

In 1898, in May, Mrs. Gaffey had a stroke of paralysis. She was paralyzed on the left side and had no power of speech for several days; her mouth was drawn up to her ear and it was several weeks before the facial affection was removed. After this time the testimony tended to show a complete change in her.

About 1896 Mrs. Gaffey began to show interest in her church Guild, which subsequently became the principal subject of her thoughts. Her grand-children, who are the principal beneficiaries of her will, testified that

prior to the stroke of paralysis in 1898, she would talk about and show some interest in her business affairs, although she could not concentrate her thoughts, but after that time she paid no attention to anything but her Guild. No matter upon what subject she was addressed the reply would be about the Guild; her answers were neither responsive to questions nor intelligent, and from that time on her two grand-children carried on Mrs. Gaffey's business and correspondence. The real estate agent and the family pleaded in vain to her to consent to have necessary repairs on her houses, with the result that she lost her tenants and one of the houses was condemned by the city. She could never remember a conversation about her business. She became very penurious. She did not know how to endorse a check, would write "Margaret" and then stop, someone had to make her finish her signature. She would often misspell her name, writing it "Gaffy, "Gafey," and "Gafny." She did not know how to make out and sign a receipt and the grand-children did it for her.

Dr. McWilliams, the family physician, desired Mrs. Knapp to have herself appointed guardian of her mother, but Mrs. Knapp refused, because she did not want "herself dragged through the neighbors' talk."

In 1896, when the groceryman called, Mrs. Gaffey would answer the door, get the order and bring it down to him, but she got so that she would forget it and would have to go up a second time and finally he had difficulty to get Mrs. Gaffey to go at all or to call anyone; she would talk to the parrot and pay no attention to the groceryman; sometimes when he got her to go up she would come down without the order and begin to talk to the parrot again.

Mrs. Gaffey neglected herself and grew so untidy in her habits and person that she required the care a child would take. At the table, in the presence of strangers she ate her food with her fingers. She would not allow the family to clean her room. From the time

of her first stroke of paralysis to her death she had to be dressed, told what clothes to put on, and when to take a bath. She would occasionally walk up Cabanne avenue at five o'clock in the evening with her shoes in her hand, and in her stocking feet on the granitoid. She appropriated small things, such as soap, from the rooms belonging to two gentleman boarders, and kept them. After her death it took two days to clean her room, and the family found one-third of a foot-bath tub filled with pieces of soap. She tried to get her nephew to go and take coal and wood from a house belonging to other people; she would go into the laundry and if the laundress went out for a moment, would take coal out of the stove and pour water on it.

At the Guild meetings she would go off to herself and go to sleep; she could not find the house of Mrs. Weiting several blocks away, although she had been in the habit of going there regularly; she would often get lost and have to be brought home; she would stay in her room for a whole week at a time and stare at vacancy, someone would have to go and bring her down to her meals; she would sing hymns at midnight. After the stroke of paralysis in 1898, Mrs. Gaffey thought that her husband, who had been dead nearly fifty years, stood at the foot of her bed at night. Two or three times a week she would think she had seen him and talked to him. She insisted on having five or six chairs in her room on which to entertain visitors who she thought came to her room to see her; as a matter of fact, no one outside of the family was ever allowed to enter her room.

From the time of the first stroke of paralysis to her death, Mrs. Gaffey labored under the belief that she had given her daughter, Mrs. Knapp, twenty thousand dollars; a recital to this effect is found in her will; she often said to the members of the family and to third persons, that she had given the house to her daughter, the plaintiff. She was remonstrated with, but could not

be reasoned out of this belief; in fact, she had lived for thirty years a pensioner upon the charity of her daughter. When the house was built, she loaned Mrs. Knapp four thousand dollars, and the lot was deeded in Mrs. Gaffey's name. A few years later, the money was repaid to Mrs. Gaffey and the title conveyed to Mrs. Knapp. Whenever Mrs. Gaffey expressed her intention in reference to her property, which she often did, she always said it would be all for her daughter; that her daughter "has it all anyhow, she is just the same as myself," that "Anna is all I have got, and when I die she will get all I have got." These statements were made both before and after the stroke of paralysis in 1898.

The evidence further was that Mrs. Gaffey loved her daughter, the plaintiff, better than anyone who lived, and often expressed her fear that her daughter was working herself to death. She had no great love for her grand-children. The will on its face speaks of Edward St. John as her nephew, whereas, the evidence shows that he was Mrs. Gaffey's cousin.

In 1900, Mrs. Gaffey had a second stroke of paralysis, and died in December, 1901, from the effect of the third stroke.

No demurrer to the evidence was offered by counsel for the proponents at the close of contestant's evidence, nor at the close of all of the evidence, but the court directed a verdict for the proponents.

The contestant also offered testimony of Doctor J. W. Smith, physician and surgeon, who testified that he had been a physician for twelve or fourteen years; was forty-two years old, and a graduate of the Missouri Medical College; that he had also made a study of the softening of the brain and paralysis and its effect on individuals of different ages, and often treated this disease in his practice. A hypothetical question based upon the facts brought out in evidence by the witnesses for the plaintiff was propounded to him, and he stated

that he did not believe that such a person in such a feeble-minded condition, with clearly-defined delusions, was in a state to understand what she was doing; that in his opinion, the paralysis with which Mrs. Gaffey was afflicted had been progressive and got worse; that it began with feeble-mindedness and wound up with the most decided delusion, which shows that it was progressive and permanent; that the delusion showed that insanity had already occurred; that hyperaemia means an excess of blood in the blood vessels, congestion and inflammation.

In rebuttal, the defendants recalled Mr. Mitchell, who testified that his acquaintance with Mrs. Gaffey extended from 1894 or 1895 until 1899; that part of that time he was receiving teller and part of the time paying teller of the St. Louis Trust Company; that Mrs. Gaffey had both a current and a savings account and deposited funds from time to time in either one or the other account; and that she had occasionally withdrawn funds; that he recalled no specific conversations with Mrs. Gaffey; that from time to time she would come by herself, and he thought he saw her at least once a month during the five years; that she never told him how her property was invested or where she received the funds she deposited, but she talked to him about her current business, and brought her books to be balanced; that when he was receiving teller, she would hand in her book with the deposit slip and check; that he did not have to help her any more than he helped other people, he never noticed she was unable to spell or write her name; that he had no recollection of her asking his advice about business; that he thought she was competent to transact business of that character. On cross-examination he stated that before saying that Mrs. Gaffey made out her own slips in the years 1898 and 1899, he would have to refer to the records; that he had no distinct recollection that Mrs. Gaffey ever made out a single slip for deposit herself; that he

did not know whether the slips were made out by Mrs. Gaffey or some one else; that he could not say that she came as often as once a month during the year 1898; that he could not state that Mrs. Gaffey called at all at the office of the Trust Company between the second of May and the second of November, 1898. He was shown a book which he identified as Mrs. Gaffey's current account book, which showed the current account was opened in 1892; that he did not have any recollection how often she made deposits in that account. During the years 1896, 1897 and 1898, the book showed that there was a deposit June 3, 1896, one May 17, 1897, one March 4, 1898, one April 5, 1898, one May 9, 1898, and there were no other deposits after May 9, 1898. On redirect examination he was shown a ledger of savings account which showed deposits from May 9, 1898, down to November 2, 1898, when there was a credit balance of $372.53. On December 20, 1898, $370 was drawn out, leaving a balance of $2.53, and subsequent deposits during 1899, 1900 and 1901, the last deposit, November 18, 1901, being $160. On cross-examination he stated that he did not know whether other persons made those deposits for Mrs. Gaffey or not; that he did not remember Miss Georgia Knapp or her brother Lester Knapp making deposits; he did not remember who drew out the $370 on December 20, 1898; he stated that he had looked up the check of $370.00 and it was put through the clearing house; it was impossible for him to state whether that check was presented by Mrs. Gaffey or not. It was made out payable to Mr. Knapp and sent through the clearing house, payment was declined because the pass-book did not accompany the check, but who finally presented the check the witness was unable to state.

William Elmer, the rector of the Church of the Ascension, testified that he had known Mrs. Gaffey in the two parishes of which he was rector; that when he

199 Sup.—42.

went to St. Phillip's in 1900 he found Mrs. Gaffey there; that during the year 1898, Mrs. Gaffey was not his parishioner; that he did not see her during that year to know her; that she impressed him as a woman or ordinary intelligence; that during his second rectorate he came closer to her in her guild work; that during the last two years of her life, he saw her nearly every week; he found her a woman shrewd, very shrewd, and she always knew what she was doing; that during his acquaintance of ten years he never knew her to be irrational. On cross-examination he stated that Mrs. Knapp was a parishioner of his at the Church of Ascension; that he had no altercation with Mrs. Knapp, although she might have had some with him; admitted that she might have accused him of untruthfulness, admitted that he had called on Mrs. Weiting and that the case was talked about, but that he did not go to see her for that purpose; that he did not tell her not to come down to testify or threaten her; that he voluntarily gave the attorneys for defendant the names of members of the Guild to get to testify.

R. W. Fisher testified he had been chief clerk in the savings department of the Mississippi Valley Trust Company; that prior to that time for four years he was teller in the same department; that he did not know Mrs. Gaffey personally, but the books of the company showed a balance January 2, 1897, of $2.19; a deposit of $10 February 1, 1900; April, 1900, $10; May 2, 1900; January 3, 1901, $10; May 20, 1901, $10; December 1, 1901, $10.

Mrs. Anna M. Baker testified that she was acquainted with Mrs. Gaffey during the three years prior to her death, saw her every Sunday and Friday at church and at the Guild; that her record of attendance at the Guild was the best of all but one. She could not recall any conversation in which Mrs. Gaffey appeared irrational; on the contrary she thought she was decidedly rational in her conversation with witness. She

never noticed that she was careless or untidy in her dress. She talked some of her business affairs and was entirely coherent and intelligible in her conversation.

Mrs. Bradley testified in substance very much the same as Mrs. Baker. Mrs. Gaffey was not much of a hand to talk at the Guild, but was an industrious worker. She was asked if she was coherent in her conversation and she answered "Well, I never talked with her enough to ——— my opinion is that she was old and rather ——— as all people are usually when they get old, as I expect to be myself." Q. "Well, you saw that when she did talk, she talked intelligently, did she?" A. "Well, if I asked her a question she answered it." Q. "Answered it intelligently?" A. "Well, it was usually if I asked her a question, if I should say something or other about the work she was doing, and she did her work well." The witness then stated that the only thing unusual that she remembered about Mrs. Gaffey was that the Guild needed about two bolts of gingham and did not have the money to buy it and Mrs. Gaffey loaned her five dollars and she told her she would give it back to her the next Friday, and when witness handed the five dollars back to her the next Friday, she did not know what it was for, and did not remember loaning it to her, she thought that she was old and that her memory was bad.

The defendant then introduced a note signed by Margaret Gaffey for $500, and Mr. Orr stated that in administering the estate they had paid that note. There was also a note and deed of trust executed by Mrs. Gaffey and outstanding at her death held by Joseph Wachtel; this note was a subsisting claim against Mrs. Gaffey at the time of her death and was proven up by George W. Groves.

Mr. Belding was recalled by plaintiff and testified that he knew Mr. Elmer's reputation for truth and veracity and it was bad.

I.  As this is an action at law·in which the parties are entitled to a jury, the only question presented by this appeal is whether there was any substantial evidence tending to prove that Mrs. Gaffey did not have sufficient mental capacity to execute a will.  The circuit court held there was no such evidence and directed a verdict establishing the writing as the last will and testament of Mrs. Gaffey.

In 1 Redfield on Wills (2 Ed.), p. 106, the learned author, in discussing the testimony as to the mental capacity of a person making a will, among other things says: "It should come, as far as practicable, from those persons who have had extensive opportunity to observe the conduct, habits and mental peculiarities of the person whose capacity is brought in question, extending over a considerable period of time, and reaching back to a period anterior to the date of the malady." In 1 Jarman on Wills (5 Am. Ed.), p. 96 (note), it is said: "The attesting witnesses to a will are, by the law, placed around the testator as a guard to protect him from fraud, imposition, and undue influence, and to judge of his capacity.  It especially devolves upon them, then, in the case of a will of a very aged person, to be fully persuaded of the possession, by him, of competent memory and mind for the transaction then being performed. It is, therefore, particularly desirable that the will of such a person should be attested by those who have been, for considerable time, acquainted with him, as *dementia* is often very deceptive with those who are not familiar with the party affected thereby."

It is evident that the foregoing rules were ignored in procuring attesting witnesses to the will in contest. Mr. Dubrouillet stated that he knew he attested the will from his signature, but had no recollection of the transaction; he did not know where the attestation took place, nor what kind of a looking person Mrs. Gaffey was, and did not know her before the attestation nor

since; he made no inquiry about her mental condition, he simply concluded from the fact that he attested the will that he must have determined that Mrs. Gaffey was of sound mind. Mr. McIlvaine, the other attesting witness, did not remember anything about the circumstances; he was not able to state that Mrs. Gaffey said a single word in his presence; he did not know her before he attested the will, was not sure who was present, but thought Mr. Orr must have been there; he thought the will was handed to him by Mr. Orr, and he asked the testatrix, "Do you want me to sign this will?" Had never seen Mrs. Gaffey before and carried on no conversation with her; if he had not thought she was sane he would not have signed the will. Mr. L. S. Mitchell testified that he was paying teller of the Trust Company, and remembered Mrs. Gaffey as a lady who occasionally made deposits in the Trust Company; whether the checks were endorsed and the slips made out before she came, he did not know. Mr. Orr, the trust officer, who drew the will in question, testified that he was not acquainted with Mrs. Gaffey and had never seen her prior to the time he was asked to draw her will; he thinks she was brought to his office by one of the tellers of the Trust Company, and was introduced to him as a customer who wanted to make a will. She told him in a general way what her property was, but not its value. His impression is that her conversation was clear and there was nothing to indicate that she did not know what she wanted. The conversation lasted a half or three quarters of an hour, she left, and three days later she returned, was handed the will, and she retired into a room by herself. All that Mr. Orr could say in regard to her having read the will was that he would not say that he saw her read it, but would say that she said that she read it. Mr. Orr did not testify that he explained the contents of the will to Mrs. Gaffey. The trustee was given broad powers

by the will, but there is no evidence that the trust officer discussed these powers with the testatrix.

On the other hand, the plaintiff, Mrs. Knapp, placed upon the witness stand witnesses who came closely in contact with Mrs. Gaffey and had opportunities of judging of her mental condition. Mr. McMenamy testified that he was a real estate agent, and had charge of two of Mrs. Gaffey's houses for twelve years, and met her three or four times a year, during the last three years prior to her death in December, 1901, and during the year 1898, the year in which the will was executed, he came in contact with her five, six or seven times; that a change in her mental condition first became marked in June or July, 1898; that she went to sleep in his office one or twice; that her memory was very poor, and she was not able to carry on an ordinary conversation; she was not able to concentrate her mind on any business he had with her; that she would consent to have repairs made on her houses and then at the end of the month repudiate it and say that she never ordered the repairs. In his opinion, she had no capacity to carry on business. Julia Strodder, who had known her for fourteen years, testified her mind was not sound. Gray, the grocer, had known her for four years and testified she was not able to transact the business he had with her. Mr. Belding, who had known testatrix for twenty years, testified she was not capable of transacting ordinary business. Georgia Knapp, the grand-daughter of testatrix, and who was one of the legatees in the will, had known and lived with her grand-mother as long as she could remember; she testified that Mrs. Gaffey on November 2, 1898, was not capable of making a will or transacting ordinary business. Lester Knapp, her grand-son and also a beneficiary under the will, testified that his grandmother on November 2, 1898, was not a woman of sufficient mental capacity to transact ordinary business, and he was positive she did not know the amount or value of her

property. Mrs. Knapp, the plaintiff, as set forth in the detailed statement of her evidence, testified that her mother was not able on the date of the will to transact any ordinary business, or make any disposition of her property with understanding and reason. In addition to all this there was evidence tending to show that Mrs. Gaffey had been treated for softening of the brain as early as 1890, and was suffering from that ailment from that time to the date of her death. In May, 1898, Mrs. Gaffey was paralyzed on the left side and deprived entirely of the power of speech for several days. After the introduction of all this evidence on the part of the contestant, it is not strange that the learned counsel for the proponents did not demur to the evidence on the part of the contestant, nor ask at the close of all the evidence, that the verdict be directed for the defendants. The rule of practice is well settled in this State that a will contest is an action at law, and this court will not reverse the judgment because the jury found against the weight of the evidence, but this court will examine the record to see if there is any testimony to support the finding, and where there is no evidence whereon to base the verdict, the judgment will be reversed. [State ex rel. v. Guinotte, 156 Mo. 520; McFadin v. Catron, 138 Mo. 227; Roberts v. Bartlett, 190 Mo. 695.]

In a general way testamentary capacity has been defined by this court on various occasions to be that the testator, at the time of the execution of his will, should have sufficient understanding and intelligence to transact his ordinary business affairs and to understand the nature and character of his property and the persons to whom he was giving it. [Brinkman v. Rueggesick, 71 Mo. 553; Farmer v. Farmer, 129 Mo. 534.] And it has often been said that a man may be capable to make a will and yet incapable of making a contract or managing an estate. [Hamon v. Hamon, 180 Mo. 685.]

Accepting these rules for our guidance in the ex-

amination of the evidence offered and received on the behalf of the contestant, Mrs. Knapp, it tended to show, and by witnesses who had exceptional opportunities to observe and judge of her mental capacity, that Mrs. Gaffey had not the mental capacity to execute a valid will, but was afflicted with senile dementia, and labored under well-defined delusions, and that the alleged will was the product of an insane delusion. That the contestant was entitled to have this evidence submitted to a jury under proper instructions from the court, we have no doubt whatever. While this court has upheld with a firm hand the right of a person of sound mind and disposing memory to dispose of his property by last will, and has rejected evidence of mere eccentricities to defeat that right, and has not hesitated where there was no substantial evidence to show incapacity on the part of the testator to make a valid will, to establish the same notwithstanding the verdict of the jury to the contrary, no case can be found where the contestant presented such a mass of testimony tending to show the incapacity of the testator in which the right of trial by jury has been denied.

In the very recent case of Roberts v. Bartlett, 190 Mo. 680, the facts were very similar to those presented on this appeal. In that case it was held that in view of the evidence of extreme debility from old age and the radical change that had taken place in the testator, as testified to by those who had known him in his vigorous manhood and his successful career as a merchant, coupled with the evidence of his utter disregard of the laws of cleanliness and health and his incapacity to realize the needs of his helpless and insane wife, a case was made which should have been submitted to a jury to determine whether the testator had sufficient mental capacity to make a will. In this case the facts testified to by the witnesses for the contestant show a no less marked change had taken place in Mrs. Gaffey prior to her execution of the will in contest, a change which had

been noticed by her relatives and intimate friends from 1890 when Dr. McWilliams began to treat her for mental disorder. Whether Mrs. Gaffey was competent to execute a valid will could best be determined by the jury by a comparison of herself at the date of the will with herself in her earlier and middle life as she was known by those who had opportunities to observe and measure her mental qualifications.

A marked change in a person's habits and thoughts is evidence of mental unsoundness. Insanity is indicated by proof of acts, declarations and conduct inconsistent with the character and previous habits of the person. As said by Schouler on Wills (3 Ed.), p. 103: "Insanity, to define that word, settles, as we have already indicated, in the opinion of the best medical men, into a comparison of the individual with himself and not with others; that is to say, some marked departure from his natural and normal state of feeling and thought, his habits and tastes, which is either inexplicable or best explained by reference to some shock, moral or physical, or to a process of slow decay, which shows that his mind is becoming diseased and disordered." Rood on Wills, sec. 119, states the true standard of comparison: "The thought, desire or act which is claimed to show insanity must not be tried by any ideal of propriety, but by comparison with the character of the same person when he was sane, and in view of any circumstances of the particular time which might have induced the peculiar act, belief or desire. It is the prolonged departure, without adequate external cause, from the state of feeling and modes of things usual to the individual when in health, that is the true feature of a disordered mind. Has he, who was refined, mild, kind and affectionate, become vulgar, scurrilous, abusive and hateful, or was he always so? Has anything occurred which could produce such a change in a sane person? Insanity produces certain changes in the whole nature without any external cause."

Tried by those tests the evidence for the contestant tended to show that a generous, dainty, refined and intelligent woman of good business capacity had in the last ten years of her life, become utterly untidy in her habits and person, penurious, and had lost her memory and business capacity, and was in many respects strikingly different from herself in previous years, and this change could not be attributed to anything in her external life and surroundings.

Many cases decided by this court concur in holding that where the evidence is conflicting as to the capacity of the testator or testatrix to make a will, it is a question of fact for the jury to determine as to her capacity to make a will. [Appleby v. Brock, 76 Mo. 314; Moore v. McNulty, 164 Mo. 111; Kischman v. Scott, 166 Mo. 214; Southworth v. Southworth, 173 Mo. 73, and cases there cited; Aylward v. Briggs, 145 Mo. 604.]

In Appleby v. Brock, supra, the finding was against the will and it was objected in this court that there was no evidence to support such a finding, but it was said: "In the absence of any declarations of law showing what rule was adopted by the trial court in determining the capacity of the testator to make a will, it must be presumed that the court adopted the true rule for its own guidance, and the belief of the witnesses, of whose general intelligence and capacity to form an opinion on the subject the trial court, having them before it, was much better qualified to judge than we are, taken in connection with the age and bodily infirmities of the testator, and other circumstances in evidence, were certainly sufficient to warrant the court in finding that the testator did not have mind enough to make a lawful disposition of his property by will. Although from testimony in this regard we might have reached a different conclusion from that arrived at by the circuit court, yet, as we cannot pass upon the weight of evidence, the judgment must be affirmed." [See, also,

Petefish v. Becker, 176 Ill. 448; Petrie v. Petrie, 6 N. Y. Supp. 831.]

But there is another reason why this case should have been submitted to the jury. The evidence on the part of the contestant tended very strongly to demonstrate that Mrs. Gaffey was laboring under the insane delusion that she had given her daughter, Mrs. Knapp, twenty thousand dollars, and that the will in contest was the product of such insane delusion. That Mrs. Gaffey was laboring under the delusion that she had given her daughter, Mrs. Knapp, twenty thousand dollars appears upon the face of the will, and for that reason alone she made no further provision for her, except the income from the trust estate, whereas the evidence clearly showed that Mrs. Gaffey had not only not given Mrs. Knapp any money or any kind of property whatever, but the fact was that she had for thirty years of her life lived upon the bounty of her daughter. In Redfield on Wills, vol. 1, *page 87, the learned author says: "The case of Stanton v. Wetherwax, 16 Barb. 259, contains a careful and well-chosen definition of insane delusion. Whenever the person conceives something extravagant to exist, which has in fact no existence whatever, and he is incapable of being reasoned out of this false belief, it constitutes insanity; and if this delusion regard his property, he is incapable of making his will." And at *page 79: "Whenever it appears that the will is the direct offspring of the partial insanity or monomania under which the testator was laboring, it should be regarded as invalid, though his general capacity be unimpeached." Rood on Wills, sec. 132, thus states the distinction between error and insane delusion: "An insane delusion has been variously defined to be a belief in something which no sane person would or could believe, something in the nature of things impossible, or which has no foundation in fact. . . . An insane delusion is a belief induced by insanity. . . . The error is simply a means of de-

tecting it, and not always satisfactory at that." In 1 Wharton & Stille, Med. Jur., pp. 84, 85, the doctrine is stated in this form: "And to invalidate a will it must appear that the testator was subject to a delusion as to the facts within his own observation, in the existence of which he actually believed, which a rational man, from the use of his senses, under the same circumstances, would have known not to exist. To invalidate a will, a delusion upon the part of the testator must have been not only the inducing cause of it, but also an existing one at the time the will was made."

This subject received full consideration by this court in Benoist v. Murrin, 58 Mo. 307, in which the conclusion was reached that "the correct principle is, that whenever a person imagines something extravagant to exist, which really has no existence whatever, and he is incapable of being reasoned out of his false belief, he is in that respect insane; and if his delusion relates to his property, he is then incapable of making a will."

An instruction embodying this principle given by the circuit court was approved in that case. The same doctrine was subsequently announced in Garland v. Smith, 127 Mo. 567, in the instruction given by the circuit court, and while this court was not called upon to pass directly upon the instruction, it is obvious that it was in line with the previous decision in Benoist v. Murrin.

Elsewhere this same doctrine has been affirmed by the courts of last resort in other States of the Union. [Miller v. White, 5 Redf. 320; Rivard v. Rivard, 109 Mich. 98; Thomas v. Carter, 170 Pa. St. 272, 283; Robinson v. Adams, 62 Me. 369; Lucas v. Parsons, 24 Ga. 640; Society v. Hopper, 33 N. Y. 619; Society v. Price, 115 Ill. 623.]

In view of this great array of authority we think it is too clear for further discussion that the contestant was entitled to have the question submitted to the jury

under a proper instruction as to whether this will was not the result of an insane delusion that the testatrix had given to Mrs. Knapp twenty thousand dollars, and for that reason had practically disinherited her only daughter.

As the case must be reversed it is proper that we should note another assignment of error, to-wit: That the circuit court improperly held that the entries in the account book of Dr. McWilliams were only admissible for the purpose of showing that at certain dates the doctor made certain charges for visits to Mrs. Gaffey. It is insisted by the learned counsel for the plaintiff that these entries were admissible as evidence of the other fact stated therein, to-wit, the nature of the disease for which he treated Mrs. Gaffey. Dr. McWilliams, who made the entry, was shown to be dead. The first entry is a fair sample of the others and was in this form:

"1890. Mrs. Marg. Gaffey, 5886 Cabanne Place:
June 24, Hyperaemia of Brain, 1 visit and med. $2.00
June 24, By cash paid.....................$2.00"

In Higham v. Ridgway, 10 East 109, the proposition now urged by the appellant received great consideration by the court of King's Bench in 1808. In that case the question was as to the date of the birth of a child. There was offered in evidence an entry from the book of a man mid-wife, in which he had entered a charge, stating the services, and acknowledged the receipt of the payment. It was objected to and discussed at great length by counsel pro and con, and it was held by the court, all the judges concurring, that the entry was admissible as evidence of the birth and the time, as well as of the receipt of the payment. Lord ELLENBOROUGH, C. J., said: "I think the evidence here was properly admitted upon the broad principle on which receivers' books have been admitted; namely, that the entry was made in the prejudice of the party making

it. . . . . It is idle to say that the word *paid* only shall be admitted in evidence without the context, which explains to what it refers."

Le Blanc, J., states: "But here the entries were made by a person who, so far from having any interest to make them, had an interest the other way; and such entries against the interest of the party making them are clearly evidence of the fact stated, on the authority of Warren v. Greenville, and of all those cases where the books of receivers have been admitted." Grose and Bayley, JJ., concurred in separate opinions to the same effect. In Taylor v. Witham, L. R. 3 Ch. Div. 605, Jessel, M. R., in admitting the entry in evidence, said: "It is, no doubt, an established rule in the courts of this country that an entry against the interest of the man who made it is receivable in evidence after his death for all purposes. . . . If I at once admit the entry as being naturally and prima-facie against interest, I should say the use which has been made of it is quite immaterial; that is according to all the authorities." And this statement of the law is accepted as correct by Greenleaf in his work on Evidence (16 Ed.), sec. 152. In Percival v. Nansen, 7 Exch. 1, it was said by Pollock, C. B: "If the entry is admitted as being against the interest of the party making it, it carries with it the whole statement." In Smith v. Blakey, L. R. 2 Q. B. 326, it was said by Blackburn, J.: "And no doubt when entries are against the pecuniary interest of the person making them, and never could be made available for the person himself, there is such a probability of their truth that such statements have been admitted after the death of the person making them, as evidence against third persons, not merely of the precise fact which is against interest, but of all matters involved in or knit up with the statement." [Higham v. Ridgway, 10 East 109.] In 16 Cyclopedia of Law and Procedure, p. 1218, it is said: "Declarations against interest are not only received as evidence of the fact

directly asserted, but of incidental facts fairly embraced within the scope of the declaration." In view of this practically unanimous statement of the rule, we think that the entries were admissible not only for the purpose of showing that at certain dates Dr. McWilliams rendered medical services to Mrs. Gaffey, and was paid therefor, but also for the purpose of showing that he treated her for hyperaemia of the brain and for softening of the brain and paralysis, and the circuit court erred in holding otherwise.

For the errors noted, the judgment of the circuit court is reversed and the cause is remanded for a new trial in accordance with the views herein expressed.

*Burgess, P. J.,* and *Fox, J.,* concur.